ATTORNEY GENERAL v ANKERSEN

Docket Nos. 68079, 79829. Submitted July 2, 1985, at Lansing.—
Decided February 3, 1986.

Plaintiffs, the Attorney General, the Director of the Department
of State Police, the Director of the Department of Natural
Resources and the Natural Resources Commission, as the
agents of the State of Michigan filed suit in Oakland Circuit
Court against defendants, B. Richard Ankersen and others who
were various partnerships and individuals who owned and
operated a waste disposal business, seeking: (1) abatement of a
nuisance caused by improper storage of hazardous industrial
waste resulting in a fire hazard; (2) imposition of a lien on the
property and/or payment of costs for expenses incurred in
investigating, securing and abating the hazard; and (3) indem-
nification from a surety company. At a show cause hearing, all
of the parties agreed to the entry of an order providing that the
Director of the Michigan State Police, through its Fire Marshal
Division, would dispose of the hazard on the premises. The
parties reserved the issues of liability, cost allocation and
determination of a fire hazard for trial. The state completed the
cleanup at a cost of $685,965, of which it recovered $156,598

REFERENCES

Am Jur 2d, Eminent Domain §§ 157 *et seq.*, 478 *et seq.*

Am Jur 2d, Equity §§ 136 *et seq.*

Am Jur 2d, Municipal Corporations, Counties, and Other Political
Subdivisions §§ 452 *et seq.*

Am Jur 2d, Municipal, School, and State Tort Liability §§ 27 *et seq.*,
293.

Am Jur 2d, Nuisances § 106.

Liability of urban redevelopment authority or other state or munic-
ipal agency or entity for injuries occurring in vacant or aban-
doned property owned by governmental entity. 7 ALR4th 1129.

"Coming to nuisance" as a defense or estoppel. 42 ALR3d 344.

Validity of municipal regulation of storage or accumulation of
lumber, straw, trash, or similar inflammable material. 64 ALR2d
1040.

See also the annotations in the ALR3d/4th Quick Index under
Corporate Officers, Directors, and Agents; Estoppel and Waiver;
Fires; Inverse Condemnation.

from settlements with various producers of the hazardous waste who were originally named as defendants. The state sought the balance in damages from the remaining defendants. Defendants Boratan Co., Boraks and Tann filed a counterclaim against plaintiffs alleging that the Director of the Department of Natural Resources and the Natural Resources Commission participated in the creation of a nuisance and that their actions amounted to an uncompensated taking of property. The circuit court, Gene Schnelz, J., granted defendants' motions to dismiss at the close of plaintiffs' proofs after finding that: (1) the actions of the DNR precluded the state from recovering against the original landowners Boratan Co., Boraks and Tann and the subsequent purchaser defendant Gene P. Stanley; (2) the DNR welcomed and acquiesced in the attempts of defendant partnerships to rectify the situation; and (3) the plaintiffs had not succeeded in piercing the corporate veil of Ankersen Resources Systems, Inc., so as to ascribe liability to defendant Ankersen. The court further found that the plaintiffs failed to provide unbiased expert testimony regarding the existence of a fire hazard and that plaintiffs failed to show "imminent danger", two elements necessary to invoke the relief provisions of the Fire Prevention Code. Plaintiffs filed a claim of appeal from the circuit court's opinion and order. However, the Court of Appeals returned the claim of appeal because the counterclaim of defendants Boratan Co., Boraks and Tann was still pending. Trial commenced on defendants' counterclaim and, in an opinion, the circuit court ruled that defendants-counterplaintiffs failed to plead facts in avoidance of governmental immunity and dismissed the counterclaim. Plaintiffs refiled their claim of appeal and defendants-counterplaintiffs appealed as of right from the order dismissing their counterclaim. *Held:*

1. The circuit court erred in ruling that the state was equitably estopped from recovering against any of the defendants. Defendant Oakland-Ankersen Associates and its defendant partners did not rely to their detriment on any action, inaction or statements of the DNR in purchasing the waste disposal business and neither could defendant landowners Boratan Co., Boraks and Tann have claimed that they relied to their detriment on the DNR's issuance and renewal of a license to ARS as implicit representations by the DNR that the method of waste disposal was feasible and that the DNR would monitor the site to ensure that ARS remained in compliance with its license.

2. There was insufficient evidence on the record showing bad faith or lack of morality on the part of the DNR which would

have justified invoking the doctrine of unclean hands in precluding the state from recovering against defendants.

3. The fault of the state in allegedly participating in the creation of the nuisance had nothing to do with whether the state could abate the nuisance under the Fire Prevention Code. The code authorizes the state to go onto a property and abate a fire hazard in order to protect the public without regard to who created the hazard.

4. The circuit court concluded that plaintffs proceeded against defendant landowners under section 23 of the Fire Prevention Code, which provides that a fire hazard is a nuisance and that if the state fire marshal considers a fire hazard to be imminently dangerous or menacing to human life, he may bring an action in the circuit court to abate, remove, correct or discontinue the fire hazard. In fact, plaintiffs were proceeding under both sections 23 and 16 of the code. Section 16 provides that where a defendant, in an action brought by the state fire marshal after a defendant's noncompliance with the state fire marshal's order to repair a building, fails to comply with a court order to repair a building, the state fire marshal, upon the court's order, may enter the premises to abate the fire hazard and place a lien upon the lands and premises for the attendant costs of abating the fire hazard. The circuit court erroneously interpreted section 23 to require that an imminent danger be established before proceeding under that section. The requirement that the fire hazard be imminently dangerous or menacing to human life is merely a procedural requirement necessary to bypass the time consuming requirements of sections 8 through 16 where the state fire marshal considers the hazard to require immediate abatement because it is imminently dangerous. It is not an additional substantive requirement to reimbursement where the fire marshal sees fit in its discretion to bring a proceeding under section 23. The defendants, by agreeing to let the state conduct the cleanup, waived the procedural requirements of notice and an opportunity to conduct the cleanup themselves under section 16 and any requirement that the fire hazard be considered imminently dangerous under section 23. The issues properly before the lower court under the Fire Prevention Code were whether the premises constituted a fire hazard and, if so, allocation of the costs of the cleanup under sections 23 and 16.

5. The circuit court erred in refusing to accept plaintiffs' witnesses, who were fire marshal division detectives, as experts. A trial court should not weigh a proffered expert's credibility when making a determination as to whether the witness is

qualified to testify. Credibility goes to the weight to be accorded the testimony. The Legislature has given the fire marshal division authority to enforce the Fire Prevention Code, which includes authority to make a determination that a fire hazard exists. There is a statutory presumption that a finding by the state fire marshal of a fire hazard is prima facie evidence of that fact. On remand, trial should continue and the defendants must present evidence sufficient to overcome the statutory presumption that there was in fact a fire hazard on the premises.

6. If, after defendants have presented their proofs and on remand the trial court finds the existence of a fire hazard, then allocation of the costs is required. Section 16 provides that the cost of abating a fire hazard is a lien upon the land while section 23 provides that a court may defray the cost and expense of abatement as a court considers equitable and as authorized by the Fire Prevention Code. Reading sections 16 and 23 together, the Court of Appeals concluded that the costs of abating the fire hazard are a lien on the property, to the extent that the amount is not reduced by any defenses defendants may establish against the state. The circuit court should equitably apportion costs (after reduction by defenses established against the state, if any) among the various defendants as it finds equitable. Costs apportioned to defendants who are insolvent would be recovered through the lien on the land. To the extent that any defendant was not responsible for perpetrating or creating the hazard, such defendant would be free from liability under the doctrine of equitable apportionment. However, the landowner's lack of culpability would not free the land from the lien.

7. Defendant Stanley, who was the subsequent purchaser of the premises, purchased the property with constructive notice of plaintiffs' claim for a lien. Plaintiffs are entitled to enforce the lien against defendant Stanley under the provisions of the Fire Prevention Code. The circuit court therefore erred in dismissing the suit as to defendant Stanley.

8. The circuit court erred in concluding that defendant Ankersen was not personally liable. A corporate employee or official is personally liable for all tortious or criminal acts in which he participates regardless of whether he was acting on his own behalf or on behalf of the corporation. The record was replete with evidence of Ankersen's participation in the creation of the nuisance.

9. The circuit court properly dismissed defendants Boratan Co., Boraks and Tann's counterclaim against the plaintiffs on

the basis that it was barred by governmental immunity. Defendants did not plead facts in support of their contentions that the state created the nuisance and that their claim fell within the nuisance exception to governmental immunity.

10. The state's actions involving the premises did not result in an inverse condemnation.

11. Defendants-counterplaintiffs' other claims were not pled in their counterclaim and therefore were not preserved on appeal.

The circuit court's dismissal of the counterclaim by defendants Boratan Co., Boraks and Tann was affirmed. The circuit court's dismissal of plaintiff's claims against defendants was reversed, and the case remanded for a continuation of the trial.

1. ESTOPPEL — EQUITY.

Estoppel arises where: (1) a party, by representation, admissions, or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of those facts.

2. ESTOPPEL — EQUITY.

Although equitable estoppel may be invoked against the state when justified by the facts, the doctrine should not be lightly invoked against the state when its application tends to thwart public policy.

3. EQUITY — CLEAN HANDS — APPEAL.

The clean hands maxim is a self-imposed ordinance that closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant; the doctrine is to be invoked by a court in its discretion to protect the integrity of the court; appellate review of a trial court's finding of unclean hands is *de novo*.

4. STATUTES — FIRE PREVENTION CODE.

The Fire Prevention Code is a remedial statute designed to prevent fires and protect persons and property from exposure to the dangers of fire and explosion; it was in part designed to provide for the regulation of storage and transportation of hazardous materials (MCL 29.1 *et seq.;* MSA 4.559[1] *et seq.).*

5. STATUTES — FIRE PREVENTION CODE — ABATEMENT OF FIRE HAZARDS — FIRE MARSHAL.

The Fire Prevention Code authorizes the state fire marshal to go onto a property and abate a fire hazard in order to protect the

public without regard as to who created the hazard (MCL 29.1 et seq.; MSA 4.559[1] et seq.).

6. STATUTES — FIRE PREVENTION CODE — ABATEMENT OF FIRE HAZARDS.

The Fire Prevention Code provides that: (1) the state fire marshal may inspect premises and issue orders to their owners to abate a fire hazard; (2) file a petition for an order to show cause in circuit court if an owner fails to comply with the order issued by the state fire marshal; (3) the circuit court may direct the state fire marshal to abate the fire hazard with the costs incurred imposed as a lien upon the land (MCL 29.8-29.16; MSA 4.559[8]-4.559[16]).

7. STATUTES — FIRE PREVENTION CODE — ABATEMENT OF FIRE HAZARDS.

Where the state fire marshal determines a fire hazard to be imminently dangerous or menacing to human life so that the public safety requires its immediate abatement, removal, correction, or discontinuance, the state fire marshal may bring, or cause to be brought, in the circuit court of the county in which the fire hazard is located, an action for the purpose of abating, removing, correcting, or discontinuing the fire hazard; the court may direct that the abatement of the fire hazard be done by the department of state police under such instructions as the court may specify, and with provision for defraying the cost and expense of the abatement as the court considers equitable and authorized by the Fire Prevention Code (MCL 29.23; MSA 4.559[23]).

8. WITNESSES — EXPERT WITNESSES.

A trial court should not weigh a proffered expert's credibility when making a determination as to whether the witness is qualified to testify; rather, credibility goes to the weight to be accorded the testimony.

9. STATUTES — FIRE PREVENTION CODE — FIRE HAZARDS — FIRE MARSHAL.

The fire marshal division has been given the authority by the Legislature to enforce the Fire Prevention Code, which includes making a determination that a fire hazard exists; there is a statutory presumption that a finding by the state fire marshal of a fire hazard is prima facie evidence of that fact (MCL 29.12; MSA 4.559[12]).

10. TRIAL — PARTIES — DEFENSES.

Where a state sues, it is limited in its recovery by any defenses which might be set up against individual plaintiffs.

11. STATUTES — JUDICIAL CONSTRUCTION.

Courts are bound to construe statutes so as to give them validity and a reasonable construction; seeming inconsistencies in the various provisions of a statute should be reconciled, if possible, so as to arrive at a meaning which gives effect to all parts of the statute; a construction leading to an absurd consequence should be avoided.

12. STATUTES — FIRE PREVENTION CODE — ABATEMENT OF FIRE HAZARDS — COSTS.

Where interested parties to real property agree to let the state conduct the abatement of a fire hazard, they waive the procedural requirements of notice and an opportunity to abate the fire hazard themselves and any requirement that the fire hazard be considered imminently dangerous under the provisions of the Fire Prevention Code; the costs of abating a fire hazard in such an instance are a lien on the property to the extent that they are not reduced by any defenses which the defendants may establish against the state at trial; a trial court should equitably apportion costs among the various defendants (MCL 29.16, 29.23; MSA 4.559[16], 4.559[23]).

13. LIS PENDENS — NOTICE.

A *lis pendens* is designed to warn persons who deal with property while it is in litigation that they are charged with notice of the rights of their vendor's antagonist and take subject to the judgment rendered in the litigation.

14. TORTS — PERSONAL LIABILITY — CORPORATE OFFICERS AND AGENTS.

A defendant who acts on his own behalf or as an officer or agent of a corporation is personally liable for torts in which he actively participated.

15. GOVERNMENTAL IMMUNITY — TORTS.

All state and local governmental agencies are immune from tort liability for injuries arising from the discharge of a governmental function.

16. GOVERNMENTAL IMMUNITY — NUISANCE.

Governmental immunity is not a defense to a properly pled claim of nuisance-in-fact; issuance of a permit or regulation of activity by a state agency does not result in sufficient control of property so as to ascribe nuisance liability to the state.

17. EMINENT DOMAIN — INVERSE CONDEMNATION — LICENSES.

The grant of a license by a state agency to a private citizen or a

private corporation for the purpose of allowing that person or corporation to conduct a private business cannot be regarded as a taking of private property by the government for public use; although licensing provides some assurances that a business will operate in accordance with lawful standards, and the public presumably derives a benefit therefrom, the issuance of a license does not in any way grant the public a right of use in the property; the failure of a state agency to properly supervise and regulate the licensed activity cannot be regarded as a taking of private property by the government for public use.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Stewart H. Freeman,* Assistant Attorney General in Charge, and *Thomas I. Schimpf* and *Brent Simmons,* Assistants Attorney General, for plaintiffs.

*Moll, Desenberg, Bayer & Behrendt* (by *Rodger D. Young,* and *Morris S. Friedman),* for appellees Boratan Co., Boraks and Tann.

*Carson Fischer and Potts* (by *David William Potts* and *Joseph John Moritz, Jr.),* for appellees The Crittenden Group.

Before: Shepherd, P.J., and R. B. Burns and R. L. Tahvonen,* JJ.

Shepherd, P.J. Plaintiffs, as the appropriate agents of the State of Michigan, commenced this action on February 14, 1977, seeking: (1) abatement of a nuisance caused by improper storage of hazardous industrial waste at 400 South Boulevard East in Pontiac resulting in a fire hazard; (2) imposition of a lien on the property and/or payment of costs for expenses incurred in investigating, securing and abating the hazard; and (3) indemnification from a surety company. Defendants in this suit are the various partnerships and

* Circuit judge, sitting on the Court of Appeals by assignment.

individuals who owned and operated the waste disposal business on the premises and the former and current landowners of the property. By the time of trial, the issues were narrowed to imposition of a lien and payment of costs. Plaintiffs' theories of liability were based on (1) sections 8 through 18 and section 23 of the Fire Prevention Code, MCL 29.1 *et seq.;* MSA 4.559(1) *et seq.;* (2) section 2 of the Environmental Protection Act of 1970 (MEPA), MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.,* and (3) section 6 of the water resources act, MCL 323.1 *et seq.;* MSA 3.521 *et seq.* Although the latter two statutes were set forth in the plaintiffs' pleadings, the issues concerning them are not raised on appeal, and therefore we do not address their application to this case. We do not, however, preclude further argument on these statutes below where applicable.

On April 17, 1977, defendant Boratan Company and its partners, defendants David Tann and Paul Boraks, the owners of 400 South Boulevard East, filed a countercomplaint. Although the caption named all plaintiffs as counterdefendants, counterplaintiffs only alleged a claim against the Director of the Michigan Department of Natural Resources and the Natural Resources Commission. Counterplaintiffs claimed that counterdefendants participated in the creation of a nuisance and that their actions amounted to an uncompensated taking.

Pursuant to defendants' motions brought at the close of plaintiffs' proofs, the Oakland County Circuit Court rendered an opinion on October 18, 1982, finding in essence that the state was barred from recovering on its claim since the Department of Natural Resources had participated in creating and continuing the hazardous conditions at 400 South Boulevard. The circuit court specifically found (1) that the actions of the DNR precluded

the state from recovering against the original "innocent" landowners (Boratan Company, Boraks and Tann) and the subsequent purchaser of the real property (defendant Gene P. Stanley); (2) that the DNR welcomed and acquiesced in the attempts of defendant partnerships to rectify the situation; and (3) that plaintiffs had not succeeeded in piercing the corporate veil of Ankersen Resources Systems, Inc., so as to ascribe liability to defendant B. Richard Ankersen. Further, the court found that the plaintiffs failed to provide unbiased expert testimony regarding the existence of a fire hazard and that plaintiffs failed to show "imminent danger", two elements found by the court to be necessary to invoke the relief provisions of the Fire Prevention Code. Accordingly, defendants' motions were granted and orders of dismissal were entered pursuant to GCR 1963, 504.2.

On November 22, 1982, plaintiffs filed a claim of appeal from the October 18, 1982, opinion and the orders dismissing their case. However, this Court returned the claim pursuant to GCR 1963, 518.2, now MCR 2.604, because the counterclaim of defendants Boratan Co., Boraks and Tann, the property owners, was still pending.

On May 12, 1983, trial commenced on defendants' (property owners) counterclaim. In an opinion filed on June 12, 1984, the court found that counterplaintiffs had failed to plead facts in avoidance of governmental immunity and that the issue was dispositive of their claim. An order was entered on July 10, 1984, dismissing the counterclaim. Counterplaintiffs appeal the order as of right. Plaintiffs refiled their claim of appeal as of right from the 1982 opinion and orders of dismissal. On September 7, 1984, this Court, on its own motion, consolidated the appeals for hearing and decision.

We reverse the trial court's determination at the close of plaintiffs' proofs that plaintiffs were equitably estopped from recovering any of the cost of the abatement and remand for continuation of the trial. We also reverse the trial court's finding that Ankersen's actions were protected by the corporate veil. We further find that plaintiffs were not required to show "imminent danger" to invoke relief under the Fire Protection Code. We affirm the trial court's dismissal of the counterclaims.

## I. Facts

An extended recitation of the facts follows because we believe the facts developed to date are essential for an understanding of our conclusion that the trial was terminated prematurely.

Defendant B. Richard Ankersen designed and patented a pollution-free incinerator to dispose of hazardous waste and generate electricity as a by-product. He established and incorporated Ankersen Resources Systems, Inc. On February 21, 1973, ARS entered into a five-year lease of 400 South Boulevard East in Pontiac with defendant Boratan Company and its partners, defendants David Tann and Paul Boraks (landowners), with the intention of operating a waste disposal business on the premises. On April 26, 1973, after ARS had constructed an incinerator at the site, the Water Resources Commission of the DNR issued it a liquid industrial waste hauling license.

Large amounts of hazardous waste began accumulating at the site because the incinerator was inoperable for substantial periods of time while being "debugged". John Shauver, a DNR water quality supervisor, inspected the premises several times between July and October, 1973, and noticed the growing accumulation of hazardous waste in-

side the building. Although concerned about the accumulation, Shauver apparently took no action because inside storage was being regulated by the Pontiac Fire Department and only outside storage was prohibited by the industrial waste hauling license. Beginning on October 5, 1973, Shauver observed repeated instances of waste being stored outside in violation of the conditions imposed by the license. Each time, Shauver ordered these containers removed and ARS complied. On March 21, 1974, ARS's waste hauling license was renewed in spite of the repeated violations. Shauver testified that it was the policy of the DNR to obtain voluntary compliance if possible. At the beginning of April, 1974, Shauver observed about 460 55-gallon drums being stored outside. They were not removed before Shauver's follow-up visit on May 21, 1974. On subsequent visits, Shauver saw that ARS had still not complied and that the inventory was increasing. Ankersen did not refuse to cooperate but consistently told Shauver that the incinerator would soon be operating and that the drums would then be cleaned up within two weeks.

In an effort to compel compliance, ARS was called before the Water Resources Commission on July 25, 1974. At that time approximately 2,500 drums were being stored outside. At the meeting, Ankersen indicated that the facility was being expanded and that there were problems with equipment. He urged that, if given additional time, he could easily take care of the waste stored inside and outside the facility. The meeting resulted in the issuance of permit and order No. M00071, which directed ARS to (1) discontinue the discharge of process water into the storm sewer by August 1, 1974; (2) submit a pollution incident prevention plan by September 15, 1974; (3) discontinue accepting liquid waste after September 1,

1974, unless outside storage was eliminated and an approved inventory reduction plan was implemented; (4) get approval of an inventory reduction plan by September 30, 1974, which would assure an inventory of 5,000 drums by October 31, 1974; (5) submit monthly reports on the quantity and quality of waste stored and received; and (6) comply with specific limitations on the quantity of inventory stored. These requirements met with either noncompliance or untimely compliance.

Shauver inspected the premises three times in September, 1974, and noted increases in inventory. He also discovered that scrubber water had been discharged into the sewer system after August 1, 1974.

In October, 1974, thousands of gallons of waste laced with cyanide were discharged into the Pontiac sewer system from 400 South Boulevard and ultimately resulted in a large fish kill in the Clinton River. It is unclear whether the discharge was intentional or accidental and whether it was done at the direction of Ankersen or ARS employees. Apparently, it was not known that the waste contained cyanide. It is also unclear when the DNR traced the cyanide spill to ARS. The only evidence of when the determination was made is a letter which was sent to Ankersen on April 11, 1975, asking that he pay damages.

In late October, 1974, ARS was seized by the Internal Revenue Service and temporarily shut down. The DNR did not take any action through November even though ARS had not complied with permit No. M00071.

On November 27, 1974, ARS sold its equipment and machinery and assigned its lease of the premises to defendant Oakland-Ankersen Associates. Defendants Del Rey-Ankersen Associates and

Seven Sisters-Ankersen Associates were formed shortly thereafter to raise capital for research and development. Defendants Richard Crittenden and William Broderick are general partners of all three partnerships; the remaining partners are limited partners. The only asset of Del Rey-Ankersen and Seven Sisters-Ankersen appears to be a right to duplicate the plant after Oakland-Ankersen completed development at 400 South Boulevard. Ankersen was employed by Oakland-Ankersen as a consultant. Oakland-Ankersen did not agree to acquire the accumulated waste in the purchase agreement, although it later agreed to reduce the inventory of waste.

While working as a consultant in December, 1974, Ankersen, without indicating his new status, provided the DNR with a proposed pollution incident prevention plan and an inventory reduction plan. Apparently, the pollution plan was rejected and the reduction plan was never accomplished. Ankersen was dismissed as a consultant in February, 1975, when defendant Crittenden, Oakland-Ankersen's managing partner, discovered that there were several misrepresentations with regard to the purchase agreement. Ankersen's temporary replacement as plant manager was Bruce Walter, an architect who was initially hired by Crittenden to bring the facility into compliance with the Pontiac building code.

On January 22, 1975, DNR inspector Shauver prepared a staff complaint and issued a notice of show cause hearing to ARS and Ankersen. Ankersen, Walter, and Crittenden appeared at the hearing before the Water Resources Commission on February 21, 1975. At that time, the commission revoked ARS's liquid industrial waste hauling license. However, Shauver testified that due to Oakland-Ankersen's involvement, the DNR stopped

formal enforcement actions against 400 South Boulevard.

Oakland-Ankersen was never issued a liquid industrial waste hauling license. However, the commission did issue a limited permit that allowed it to contact a DNR official in order to arrange transport of limited quantities of flammable waste. The reason for issuing this permit was that flammable liquid waste was necessary to burn the nonflammable materials already on site. The permit, which was issued in March, 1975, required that an inventory reduction schedule be submitted by March 30, 1975, which would reduce the number of drums to 5,000 by June 1, 1975. Oakland-Ankersen submitted such a schedule on March 27, 1975, which was approved on April 8, 1975, with certain conditions.

On January 26, 1975, Shauver was transferred to a different division of the DNR. James Miller took over inspections of the site, but apparently not until June, 1975. It is unclear whether inspections were conducted between January and June. Nonetheless, on May 12, 1975, a notice of noncompliance and order to comply were issued to Oakland-Ankersen regarding outside storage. Although Oakland-Ankersen apparently corresponded with the DNR about this notice, there was never any compliance.

On May 1, 1975, Associates Capital Company commenced suit in Oakland County Circuit Court to regain possession of equipment used by ARS and Oakland-Ankersen. Defendant landowners attempted to evict Oakland-Ankersen in mid-May, 1975. On May 28, 1975, ARS filed a Chapter 11 petition in bankruptcy court. Although the circuit court granted Associates Capital the right to remove equipment, removal was delayed by the bankruptcy court. In addition, the bankruptcy

court apparently agreed to allow Oakland-Ankersen to re-enter the property at some future date. Boraks, one of the landowners, testified that he pleaded with the bankruptcy court to shut down operations at 400 South Boulevard because of the cyanide spill. However, the judge refused after ARS's bankruptcy attorney represented that Oakland-Ankersen would be providing two million dollars to ARS.

Miller, Shauver's replacement, testified that on his first visit to the property in early June, 1975, the only employee on the premises was a "rent-a-cop". The notice of noncompliance issued to Oakland-Ankersen on May 12, 1975, had not resulted in compliance. On June 19, 1975, the DNR received a complaint of spillage at the site. In following up on this complaint in early to mid-July, Miller observed a leaking tanker. Miller contacted the manager of Oakland-Ankersen who indicated that the tanker would not be immediately cleaned up. However, Oakland-Ankersen did have the contents of the tank pumped out and disposed of when Miller threatened to resort to an emergency fund and turn the case over to the Attorney General.

Miller visited the property regularly from June, 1975, to June, 1976. On July 16, 1975, Oakland-Ankersen submitted a new inventory reduction schedule which was based on the projections of an expert who was consulted after Ankersen's dismissal. The schedule projected that the drum reactor would be fired within 45 days of Oakland-Ankersen's gaining re-entry to the plant and that the existing inventory would be disposed of within four months of that time. The date of entry was dependent upon the bankruptcy judge's granting access to the property. Although Oakland-Ankersen did regain entry, the City of Pontiac had

already condemned the property. Moreover, Oakland-Ankersen was never completely successful in making the reactor operational. Oakland-Ankersen abandoned the property sometime in November, 1975.

DNR inspector Miller continued regular inspections after the property was abandoned in November, 1975. At some point, he recommended to David Dennis, Chief of the Oil and Hazardous Material Section of the DNR, that a second notice of noncompliance and order to comply be issued to Oakland-Ankersen. The order was not issued, according to Dennis, "due to other more pressing priorities and the apparent futility in issuing such an order". Apparently, other than regular inspections, there was no action taken by the DNR from September, 1975, to July, 1976. On July 23, 1976, the DNR sent a notice of noncompliance to defendant property owners.

No further action was taken by the DNR until December, 1976, when, in response to pressure by a group of Pontiac citizens, the DNR conducted an extensive inspection of the premises. Before the investigation commenced, the building had to be ventilated, because an explosimeter registered explosive readings in various parts of the building. Despite the ventilation, investigators working in the basement had to use explosion-proof flashlights and wear airpacks. At least one investigator became ill from the vapors. DNR investigators found over 5,000 55-gallon drums and thousands of smaller containers in the basement alone. Due to past flooding of the basement, chemical reactions, and other reasons, about 40% of the drums in the basement had leaked all or most of their contents. The floor was caked with chemicals. The first and second floors were also filled with 55-gallon metal drums and fiber packs in various stages of disre-

pair. In addition, there were many 55-gallon drums and fiber packs stored outside which showed evidence of rusting and decomposition. They also found five truck trailers and four storage tanks outside, one of which was leaking, containing approximately 20,000 gallons of liquid.

The DNR notified the Fire Marshal Division of the Michigan State Police of a potential fire hazard. Specifically, the DNR expressed the following concerns in a staff report prepared after its investigation:

"The major risk associated with the Ankerson [sic] facility appears to be from fire and explosion. Many of the materials present are flammable solvents with very low flash points. Explosive atmosphere conditions were detected within the building prior to our sampling. A large fire at this location would result in the release to the atmosphere of uncombusted toxic materials as well as toxic vapors resulting from decomposition of some of the materials. This situation would represent a serious health threat to humans in the surrounding area. The Department of Public Health has notified the local health, fire and Civil Defense people and the State Police of this situation to insure contingency plans are developed should a fire occur.

"A fire would also result in the release of toxic materials to surface and groundwaters. Water used to extinguish a fire would carry toxic materials into the ground or to sewer systems which discharge to the Clinton River and Lake St. Clair. The toxic materials and the Chemical Oxygen demand of these wastes would significantly harm these surface waters. In addition, these toxic materials could destroy the biological function of Pontiac's Secondary Wastewater Treatment Plant. This would further damage the receiving stream —the Clinton River.

"The City Fire Marshall has indicated that spontaneous combustion of the material in the fiber packs is a real possibility. Their Department has already logged a run to the location to extinguish smoking fiber barrels."

In early February, 1977, three officials from the Fire Marshal Division made independent investigations of the premises. Based on these investigations, the Fire Marshal determined that the site constituted a fire hazard, and sent notices to defendant landowners Boratan Co., Boraks and Tann on February 10, 1977, which ordered them to abate the hazard and indicate within 10 days whether they would comply. Apparently this order was met with silence.

On February 14, 1977, plaintiffs took decisive action by commencing the present lawsuit, seeking an order for abatement of the nuisance. At a show cause hearing before the Oakland County Circuit Court on March 2, 1977, all of the parties agreed to the entry of an order providing that the Director of the Department of Michigan State Police, through its Fire Marshal Division, would dispose of the hazard at 400 South Boulevard. The parties reserved the issues of liability, cost allocation and the determination of a fire hazard, until trial. The cleanup was completed on May 13, 1977, at a cost to the state of $685,965. Plaintiffs recovered $156,-598 of their costs through settlements with various producers of the hazardous waste who were originally named as defendants. Accordingly they seek $529,367 in damages from the remaining defendants.

On August 12, 1977, defendants Boratan Co., Boraks and Tann sold the property to defendant Gene P. Stanley, as trustee of the Gene P. Stanley Trust Agreement.

## II. Equitable Estoppel or Unclean Hands

The trial court determined at the conclusion of plaintiffs' proofs that the state was equitably estopped from recovering against any of the defen-

dants on the ground that: "A situation was allowed to begin, fostered by, acceded to, complied with and generally approved by the Department of Natural Resources to the extent that it in effect becomes a party to the entire incident."

As far as the various operator partnerships and individuals are concerned, we believe that the elements giving rise to estoppel are missing:

"An estoppel arises where: (1) a party by representation, admissions or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts * * *." *Cook v Grand River Hydroelectric Power Co,* 131 Mich App 821, 828; 346 NW2d 881 (1984).

It appears that Oakland-Ankersen purchased the business without having had any preliminary discussions with DNR officials. The purchase was made on November 27, 1974. The only evidence of any discussions with DNR officials is that an Oakland-Ankersen employee met with DNR officials in December, 1974, to review an "outstanding permit and order", and that in late 1974 or early 1975 Oakland-Ankersen called the DNR and announced that it would be taking charge and wished to cooperate with the state. The trial court essentially found that the DNR welcomed and took advantage of this takeover, since the takeover provided an answer to their problem. However, this finding does not constitute reliance on any action, inaction or statements of the state by defendant operator partnerships and individuals. *Cook, supra.*

Equitable estoppel was also an improper basis for denying recovery against defendant landowners. In essence, these defendants argue that, based

on the issuance and renewal of ARS's license, they relied on implicit representations by the DNR that the method of disposal was feasible and that the DNR would monitor the site and ensure that ARS remained in compliance with the license. Merely issuing a license and acquiescing in representations made by Ankersen and the other operators does not constitute facts that give rise to an estoppel. There must be more positive participation or inducement before the state can be equitably estopped from recovering a portion of the costs of enforcing the Fire Prevention Code to protect the public. We will address the question of how much of the costs the state may recover elsewhere in this opinion. We conclude that the defendant landowners could not, in deciding whether to rent to ARS, have justifiedly relied on the DNR's actions in licensing ARS or monitoring the site. Moreover, we note that although equitable estoppel will be invoked against the state when justified by the facts, the doctrine should not be lightly invoked against the state, especially when its application tends to thwart public policy. See 28 Am Jur 2d, Estoppel and Waiver, §§ 122-124; 11 Michigan Law & Practice, Estoppel, § 12.

Although the trial court used the nomenclature "equitable estoppel" to deny recovery by plaintiffs, the substance of the trial court's opinion indicates and the defendants argue that it would be more accurate to say that recovery was denied because plaintiffs came into a court of equity with "unclean hands".

In *Stachnik v Winkel,* 394 Mich 375, 382; 230 NW2d 529 (1975), the Supreme Court adopted the following description of the doctrine:

" '[The clean hands maxim] is a self-imposed ordinance that closes the doors of a court of equity to one

tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of the court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be "the abettor of iniquity." *Bein v Heath,* 6 How [47 US] 228, 247 [12 L Ed 416 (1848)].' *Precision Instrument Manufacturing Co v Automotive Maintenance Machinery Co,* 324 US 806, 814; 65 S Ct 993; 89 L Ed 1381 (1944)."

The Court stressed that the doctrine is "to be *invoked by* the Court in its discretion to protect the *integrity of* the Court". 394 Mich 386. Our review of the trial court's finding of unclean hands is *de novo.* 394 Mich 383.

Here, there was no showing that the DNR acted in bad faith or with fraud in licensing and inspecting the operation. Nor had there been a showing that the DNR sought to mislead or deceive any other party. Compare, *Stachnik, supra,* p 387. At most, the evidence may show that the DNR was *negligent* in licensing ARS in the first place and in not moving sooner to compel compliance. There is simply insufficient evidence on the record showing bad faith or lack of morality on the part of the DNR which would justify invoking the doctrine of unclean hands to protect the integrity of the court. Mere negligence in issuing a license and monitoring the premises do not constitute facts giving rise to the application of the doctrine of unclean hands. Therefore, we conclude that the trial court erred in granting defendants' motions for dismissal at the conclusion of plaintiffs' proofs on the basis of either equitable estoppel or unclean hands.

Furthermore, the fault of the state in allegedly participating in the creation of the situation has nothing to do with whether the state can abate a

nuisance under the Fire Prevention Code. That act authorizes the state to go onto a property and abate a fire hazard in order to protect the public without regard to who created the hazard. The price the state has to pay for its wrongdoing, if any, is factored into the allocation of costs discussed in section III C of this opinion. Before we determine allocation of costs, we must examine the Fire Prevention Code.

### III. THE FIRE PREVENTION CODE

A. Procedures for abating fire hazard under Sections 16 and 23.

The Fire Prevention Code is a remedial statute designed to prevent fires and protect persons and property from exposure to the dangers of fire and explosion. It was in part designed "to provide for the regulation of the storage and transportation of hazardous materials". Title Clause to Fire Prevention Code, MCL 29.1 *et seq.;* MSA 4.559(1) *et seq.* The act authorizes the state fire marshal to prevent and abate fire hazards detrimental to life and property. *Douglas v Edgewater Park Co,* 369 Mich 320, 329; 119 NW2d 567 (1963). The act further provides that a fire hazard of any nature is a nuisance. MCL 29.23; MSA 4.559(23).

Plaintiffs proceeded against the landowners under both section 16 and section 23 of the Fire Prevention Code, MCL 29.1 *et seq.;* MSA 4.559(1) *et seq.* Although the trial court concluded that plaintiffs elected to proceed under section 23 and analyzed only that section, it is clear from plaintiffs' pleadings and the pretrial order that plaintiffs were proceeding under both sections 16 and 23. The two sections provide different but related procedures for abating a fire hazard.

1. Section 16 abatement.

Sections 8 through 16 provide a means whereby the Fire Marshal Division of the Department of State Police may inspect and issue orders to the owners of premises to abate a fire hazard. Section 8 provides that the state fire marshal and other local officials may enter onto premises in order to inspect for a fire hazard. Section 9 authorizes the state fire marshal to issue an order to the owner and other interested parties to abate the fire hazard. The owner is given not less than 10 days to signify in writing an intention to comply with the order and at least 30 days to comply. Section 13 authorizes the state fire marshal to file a petition for an order to show cause in the circuit court if the owner fails to comply with the order issued under section 9. The circuit court may affirm or modify the fire marshal's order according to the facts and circumstances shown by the proofs. Under section 16, failure to obey is considered contempt of court and the circuit court may direct the state fire marshal to abate the fire hazard with the costs incurred imposed as a lien upon the land.

Section 16(1) provides:

"The refusal or failure of a defendant to comply with the terms of an order or direction of the court in the premises, within the time limited for compliance, shall be considered contempt of court for which the respondent may be cited to appear and answer in the same manner as in other cases of contempt of court. *Upon the refusal or failure the court may order the state fire marshal to execute the order and directions and abate the fire hazard* and for the purpose of executing the order and directions, to enter upon the premises and employ, or contract for, labor, tools, implements, or other assistance as is necessary for the performance of the work. *The amount of the cost and expense of executing the order shall be a lien upon the lands and premises* enforceable and collectible in the same man-

ner as provided by law in the case of mechanics' liens."
(Emphasis added.) MCL 29.16(1); MSA 4.559(16)(1).

Here, the state fire marshal inspected the premises and determined that a fire hazard existed under section 8; issued an order to abate the hazard to the property owners under section 9, which order was apparently met with silence; and brought a motion for show cause under section 16 and section 23. At the hearing on the motion for show cause, all of the parties agreed that the fire marshal would remove the hazardous waste, with the issue of liability and cost allocation reserved until trial.

2. Section 23 abatement.

Section 23 provides a separate procedure for abating a fire hazard when the state fire marshal considers a fire hazard to be "imminently dangerous or menacing to human life". Section 23 bypasses many of the time-consuming procedural requirements of sections 8 through 16. It provides:

"The *existence of a fire hazard, of any nature, origin or cause, is declared to be a nuisance* and the nuisance may be abated, removed, corrected, and its continuance enjoined in the manner provided by law for the abatement of nuisances. *If the state fire marshal considers a fire hazard to be imminently dangerous or menacing to human life so that the public safety requires its immediate abatement, removal, correction, or discontinuance, the state fire marshal may bring, or cause to be brought, in the circuit court of the county in which the fire hazard is located, an action for the purpose of abating, removing, correcting, or discontinuing the fire hazard.* Sections 3801 to 3840 of Act No. 236 of the Public Acts of 1961, being sections 600.3801 to 600.3840 of the Michigan Compiled Laws, shall be applicable to the procedure in the action. The court, in addition to the powers conferred by that act, may make any order or decree as considered necessary or expedient to en-

sure the safety and security of human life, and may direct that a building described in the bill of complaint be razed and removed and all rubbish and debris removed, or that a building be repaired and in what manner and to what extent. The court, in the order or decree, may direct and command the removal of occupancies of a building, and the discontinuance of any use of the building constituting a fire hazard or menace to human life, and may direct and command the clearing and improvement of premises as defined in this act and described in the bill of complaint. It may grant the issuance of a writ of injunction restraining the defendant from continuing the existence of a fire hazard and in the writ may include specific directions as to what shall be done by the defendant in the premises, and may retain jurisdiction of the cause for the time it shall determine to compel complete performance of the terms and conditions of an order, decree, writ, or other determination of the court in the premises. *The court may direct that the abatement of the fire hazard be done by the department under instructions as the court may specify, and with provision for defraying the cost and expense of the abatement as the court considers equitable and authorized by this act.* A continuance of a hearing of the cause shall not be granted except upon a clear showing of unavoidable circumstances. Jurisdiction of the court under this act shall not depend upon the amount of money, or value of property, involved." (Emphasis added.) MCL 29.23; MSA 4.559(23).

The trial court interpreted section 23 as setting forth a two-prong requirement for reimbursement: 1) the existence of a fire hazard, and 2) an imminent danger. The court concluded, without deciding whether there was a fire hazard, that plaintiffs had not established the existence of an imminent danger, and consequently could not recover under section 23.

We disagree with the trial court's interpretation of section 23. The requirement that the fire hazard be imminently dangerous or menacing to human

life is merely a procedural requirement necessary to bypass the time-consuming requirements of sections 8 through 16 when the *state fire marshal* considers the hazard to require immediate abatement because it is imminently dangerous. It is not an additional substantive requirement to reimbursement where the fire marshal sees fit in its discretion to bring a proceeding under section 23. Our interpretation is buttressed by the repeated use of the phrase "*a* fire hazard" throughout the section. Moreover, although defendants reserved the substantive issues of liability, allocation of costs and whether there was in fact a fire hazard until trial, by agreeing to let the state conduct the cleanup they waived the procedural requirements of notice and an opportunity to conduct the cleanup themselves under section 16, and any requirement that the fire hazard be considered imminently dangerous under section 23. We conclude that the issues properly before the lower court under the Fire Prevention Code were whether the premises constituted a fire hazard and, if so, allocation of the costs of the cleanup under sections 23 and 16.

B. Fire Hazard.

At trial, plaintiffs introduced the testimony of Fire Marshal Division detectives Eugene Schmitt and Warren Hutchinson and division chief William Rucinski to establish that a fire hazard existed on the premises. During trial, the court refused to accept them as experts because it did not view them as objective and disinterested witnesses. Although the trial court did not reach the issue of whether the premises constituted a fire hazard, it stated in its written opinion that it "was a little taken aback by the plaintiffs' insistence upon proceeding, in relation to testimony as to the

existence of a fire hazard, by relying upon employees of the plaintiff department who were in effect placed in the position of defending their own actions in spending approximately Seven Hundred Thousand Dollars and no/cents ($700,000) of the state's money in the abatement of this alleged hazard".

MRE 702 provides:

"If the court determines that recognized scientific, technical, or other specialized knowledge [1] will assist the trier of fact to understand the evidence or to determine a fact in issue, [2] a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

We can find no authority for the proposition that a trial court should weigh a proffered expert's credibility when making a determination as to whether the witness is qualified to testify. Rather, credibility goes to the weight to be accorded the testimony. Compare, *Phardel v Michigan,* 120 Mich App 806; 328 NW2d 108 (1982), *lv den* 417 Mich 1015 (1983).

Moreover, section 12 provides that abatement orders issued by the state fire marshal under section 9 "shall be presumed to be valid and reasonable and shall be prima facie evidence of the matters and things set forth in the order". MCL 29.12; MSA 4.559(12). The Fire Marshal Division has been given the authority by the Legislature to enforce the Fire Prevention Code, which includes making a determination that a fire hazard exists. There is a statutory presumption that the finding by the fire marshal of a fire hazard is prima facie evidence of that fact. MCL 29.12; MSA 4.559(12). On remand, trial should continue and the defendants must present evidence sufficient to

overcome the statutory presumption that there was in fact a fire hazard on the premises.

C. Allocation of Costs

If, after the defendants have presented their proofs on remand, the trial court finds the existence of a fire hazard, then allocation of the costs is required. We note that the state could have insisted on a determination of whether there was a fire hazard before entering onto the property to dispose of the hazardous waste, but chose not to do so and, as discussed above, that issue must be addressed by the trial court and parties on remand.

In order to aid the lower court on remand, we will assume the existence of a fire hazard and briefly address the cost recovery provisions of sections 16 and 23 of the act. We address this issue, even though not reached below, in order to modify the trial court's view that if the state is even partially at fault in contributing to the accumulation of waste, it can recover nothing. It is our view that that is not what the statute provides.

Section 16 provides that the cost of abating a fire hazard is a lien upon the land, while section 23 provides that a court may defray the cost and expense of the abatement "as the court considers equitable and authorized by this act".

Section 16 allows the state to proceed where there is no imminent danger. The cost of the state's abatement is a lien on the land. Defendant landowners have alleged that the state's own wrongdoing contributed to the buildup of hazardous waste. That raises a question about which section 16 is silent *i.e.,* the extent to which the state may impose a lien on the land for its costs where the state's own wrongdoing contributed to the buildup. The general rule is that "where a

state sues it is limited in its recovery by any defenses which might be set up against individual plaintiffs". *Ambler v Auditor General,* 38 Mich 746 (1878). See also 72 Am Jur 2d, States, § 95; 81 CJS, States, § 312. The court and parties will have to address the landowners' defenses more thoroughly below, but we hold that, to the extent that the landowners establish a valid defense against the state based upon any active culpability of the state in creating the hazard, the costs imposed as a lien on the land under section 16 shall be reduced. We decline to address the precise nature and impact of such defenses since the parties did not address them in this appeal. They were not an issue since the case was dismissed before defendants put in any proofs. We prefer to allow the parties and the circuit court to undertake an analysis of these issues as the case unfolds. Whether the amount of any reduction is in proportion to the degree of fault of the state is an issue for further development in the trial court. Another issue to be addressed on remand is whether the amount spent by the state was reasonable and necessary for the accomplishment of the abatement.

Section 23 states that the court may direct the state to abate the fire hazard, "with provision for defraying the cost and expense of the abatement as the court considers equitable and authorized by this act". MCL 29.23; MSA 4.559(23). "Equitable" means "[j]ust, fair, and right, in consideration of the facts and circumstances of the individual case". Black's Law Dictionary, 4th ed. Section 23 overcomes the cost recovery restraints of section 16 (*i.e.,* section 16 provides for a lien on the land but not equitable apportionment) and allows apportionment of the costs to all of the defendants in this action (operators and landowners) as the trial

court deems equitable based on the facts of the case.

In interpreting the language and the cost recovery provisions of sections 16 and 23, both of which apply to the case at bar, assuming the existence of a fire hazard, we are bound to construe these sections to give them validity and a reasonable construction. *In re State Highway Comm,* 383 Mich 709, 714; 178 NW2d 923 (1970). "[S]eeming inconsistencies in the various provisions of a statute should be reconciled, if possible, so as to arrive at a meaning which gives effect to all parts of the statute; a construction leading to an absurd consequence should be avoided." 383 Mich 714-715.

Reading sections 16 and 23 together, we conclude that the costs of abating the fire hazard are a lien on the property, to the extent that the amount is not reduced by any defenses which the defendants may establish against the state.

The trial court should equitably apportion costs (after reduction by defenses established against the state, if any) among the various defendants as it finds equitable. Costs apportioned to defendants who are insolvent would be recovered through the lien on the land. In other words, the lien acts as security for the amount of the costs attributable to all of the defendants. Any other interpretation that would deprive the state of a lien on the land for the reason that the landowner is not responsible for creating the fire hazard would emasculate the Fire Prevention Code and allow landowners to permit the creation of fire hazards by irresponsible or insolvent corporate or individual tenants without recourse by the state. Under the statute, the primary financial responsibility for preventing fire hazards falls on the land and consequently on the landowner who may then file claims against tenants who caused the damage. As in all transac-

tions involving insolvent tenants, the landowner runs a certain degree of risk in doing business with such persons.

We recognize that under this interpretation, the property owners could bear the largest portion of the costs. While this may seem harsh, we note that all landlords bear the risk that their tenants will damage the leased property. A landlord's remedy is a suit against the tenants. Under the Fire Prevention Code, the property owner is ultimately responsible for abating a fire hazard regardless of how or by whom it was created. We note that in this case, before the state fire marshal stepped in and abated the nuisance, the defendant property owners had an abandoned piece of property filled with thousands of leaking containers of hazardous waste. Presumably even without state intervention they would have had to clean up the premises themselves before they would have been able to find new tenants. Their remedy would have been to bring suit against the tenants to attempt to recover the cost of the damage to the property. Equitable apportionment will come close to accomplishing the same result.

Several defendants (particularly the "Crittenden Group") have alleged that they were innocent of any wrongdoing. To the extent that any defendant was not responsible for creating or perpetuating the hazard, such defendant would be free from liability under the doctrine of equitable apportionment. However, as we have indicated, the landowners' lack of culpability would not free the land from the lien.[1]

## D. Subsequent Purchaser of Property.

[1] We emphasize again that we are only addressing the responsibilities of the parties under the Fire Prevention Code. Whether there are other theories of liability or other defenses under MEPA or the water resources act were not addressed in the circuit court or in this appeal.

We next address whether the trial court properly dismissed defendant Gene Stanley, the subsequent purchaser of 400 South Boulevard.

The state fire marshal completed the cleanup on May 13, 1977. On August 12, 1977, Boratan sold the property to Stanley. Stanley testified that, when he purchased the property, he was not aware of the state's claim for a lien on the property. However, Boratan was presumably aware of plaintiffs' claim for a lien when it sold the property to Stanley, as such relief had been requested in plaintiffs' initial complaint filed on February 14, 1977.

As discussed above, section 16 of the Fire Prevention Code provides that the cost of abatement "shall be a lien upon the lands". MCL 29.16; MSA 4.559(16). Section 14 addresses the effect of a subsequent sale of the property:

"The state fire marshal, upon the issuance of the order provided for in section 9, may make and file for record in the office of the register of deeds of the county in which the land, building, or premises described in the order is situated a notice of pendency of proceedings under the order, which filing shall be constructive notice to subsequent grantees, mortgagees, tenants, or other occupants of the lands of the pendency of abatement proceedings as well as of court proceedings which shall later be instituted as provided in this act, and the order and court proceedings shall not be affected by a subsequent transfer of ownership, possession, or encumbrance of the lands, buildings, or premises." MCL 29.14; MSA 4.559(14).

Plaintiffs filed a "notice of pendency of proceedings" with the Oakland County Register of Deeds on February 28, 1977, almost six months before the sale to Stanley. The notice explicitly refers to section 14 which, in turn, implicitly refers to section 16, providing for a lien upon the land.

"[A] lis pendens is designed to warn persons who deal with property while it is in litigation that they are charged with notice of the rights of their vendor's antagonist and take subject to the judgment rendered in the litigation." *Backowski v Solecki*, 112 Mich App 401, 412; 316 NW2d 434 (1982). We conclude that, based upon the record before us, Stanley purchased the property with constructive notice of plaintiffs' claim for a lien and plaintiffs are entitled to enforce the lien against defendant Stanley pursuant to section 14 of the Fire Prevention Code. This holding is without prejudice to further factual development at trial.

## IV. Personal Liability of Defendant Ankersen

The trial court concluded that Ankersen was not personally liable, but it is not clear whether that determination was based upon a finding that Ankersen had not acted negligently or on a finding that plaintiffs had not "pierced the corporate veil" of ARS.

We note that this is not a question of piercing the corporate veil. It is beyond question that a corporate employee or official is personally liable for all tortious or criminal acts in which he participates, regardless of whether he was acting on his own behalf or on behalf of the corporation. *Allen v Morris Building Co*, 360 Mich 214, 218; 103 NW2d 491 (1960); *Trail Clinic, PC v Bloch*, 114 Mich App 700, 709; 319 NW2d 638 (1982), lv den 417 Mich 959 (1983); *Baranowski v Strating*, 72 Mich App 548, 560; 250 NW2d 744 (1976), lv den 399 Mich 881 (1977).

The record is replete with evidence of Ankersen's participation in the creation of this nuisance. Moreover, Ankersen participated in violating some

of the conditions of DNR order M00071, including, and most importantly, instructing employees to continue accepting hazardous waste in violation of that order.

We further note that the Fire Prevention Code itself creates criminal responsibility for a person who creates a fire hazard. Section 22(1) provides that "a person who violates this act, or who maintains a fire hazard in violation of this act, or rule promulgated pursuant to this act, is guilty of a misdemeanor". MCL 29.22(1); MSA 4.559(22).

Accordingly, we conclude that Ankersen should not have been dismissed at the conclusion of plaintiffs' proofs.

## V. Counterclaim

Counterplaintiffs Boratan Company, David Tann and Paul Boraks, the former landowners, alleged in their countercomplaint against the state that the state participated in the creation of a nuisance and that their acts amounted to an uncompensated taking. The trial court dismissed the counterclaim on the ground that the claims were barred by governmental immunity. We agree and affirm the trial court's order in this respect.

A. Nuisance Exception.

Counterplaintiffs first argue that their nuisance-in-fact claim falls within the nuisance exception to governmental immunity. Their theory is that by issuing the waste hauling licenses and failing to properly supervise the operation, the DNR created the nuisance.

We initially note that had this claim been framed as a negligence claim, it would have been barred by governmental immunity under *Ross v Consumers Power Co (On Rehearing),* 420 Mich

567; 363 NW2d 641 (1984). The Supreme Court in *Ross* held that all state and local governmental agencies are immune from tort liability for injuries arising from the discharge of a governmental function. "Governmental function" is defined broadly as "any activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law". 420 Mich 591. Since the DNR's activities in licensing and regulating ARS were authorized by statute, it was engaged in discharging a governmental function and therefore immune from tort liability. Counterplaintiffs do not dispute that the DNR was engaged in a governmental function. Rather they argue that these actions also created a nuisance which falls within the nuisance exception to governmental immunity.

*Ross* has not by implication eliminated the nuisance exception, as counterdefendants argue. In *Disappearing Lakes Ass'n v Dep't of Natural Resources,* one of the cases consolidated with *Ross,* the Supreme Court upheld a Court of Appeals decision that the plaintiffs had not sufficiently pleaded a nuisance claim in avoidance of immunity. The Court stated:

"The Court of Appeals conclusion that plaintiffs had insufficiently pleaded a nuisance cause of action is not clearly erroneous. Plaintiffs essentially asserted only a negligence claim." 420 Mich 657.

At most, it might be said that the Supreme Court has reserved the issue of the availability of the nuisance exception to defeat immunity until a later case. Clearly, however, the Supreme Court in *Disappearing Lakes* did not overrule its prior decisions on the issue and this Court remains bound by these earlier decisions.

A nuisance is predicated upon the existence of a

dangerous condition. *Rosario v Lansing,* 403 Mich 124, 132; 268 NW2d 230 (1978).

"'Primarily, nuisance is a condition. Liability is not predicated on tortious conduct through action or inaction on the part of those responsible for the condition. Nuisance may result from want of due care (like a hole in a highway), but may still exist as a dangerous, offensive, or hazardous condition even with the best of care.' *Buckeye Union Fire Ins Co v Michigan,* 383 Mich 630, 636; 178 NW2d 476 (1970)." 403 Mich 132.

In *Disappearing Lakes,* the facts were similar to those in the case at bar. The plaintiffs there sued the DNR for issuing licenses to dredge, which allegedly caused the creation of a nuisance. The dredging caused drops in the water level of two lakes near the plaintiffs' property.

The Court of Appeals in *Disappearing Lakes Ass'n v DNR,* 121 Mich App 61; 328 NW2d 570 (1982), *aff'd Ross v Consumers Power Co (On Rehearing),* 420 Mich 567; 363 NW2d 641 (1984), held that nuisance liability extends only to the party that *owns* or *controls* the property. It is readily apparent from *Disappearing Lakes* and the cases cited therein that "control" of the property means more than issuing a permit or regulating an activity on the property, as is alleged in the present case. We conclude, as did the Supreme Court in affirming this Court in *Disappearing Lakes,* that counterplaintiffs have essentially asserted only a negligence claim.

B. Inverse Condemnation.

In their countercomplaint, counterplaintiffs also alleged that the granting of licenses and subsequent failures to supervise and regulate the disposal operations at 400 South Boulevard proximately caused a loss of use and value in the

property and constituted a "taking". Counterplaintiffs have not alleged that the state's actions in abating the fire hazard constituted a "taking". The circuit court made no ruling concerning whether counterplaintiffs' property was the subject of inverse condemnation.

"Inverse condemnation is a taking of private property for public use without commencement of condemnation proceedings. Under [Const 1963, art 10, § 2] and [US Const, Am V], a victim of such a taking is entitled to just compensation for the value of the property taken." *Hart v Detroit,* 416 Mich 488, 494; 331 NW2d 438 (1982).

A taking may occur "without absolute conversion of the property" and may occur when "serious injury is inflicted to the property itself". *Heinrich v Detroit,* 90 Mich App 692, 697; 282 NW2d 448 (1979), *lv den* 409 Mich 858 (1980), quoting, *inter alia, Pearsall v Bd of Supervisors,* 74 Mich 558, 561; 42 NW 77 (1889). However, not every diminution in property values remotely associated with governmental actions will amount to a "taking". *Heinrich, supra,* p 698. Rather, a plaintiff must establish (1) "that the government's actions were a *substantial* cause of the decline of his property's value", and (2) "that the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property". 90 Mich App 700.

Counterplaintiffs' claim of inverse condemnation must fail as a matter of law for two reasons. First, the granting of a license to a private citizen or a private corporation for the purpose of allowing that person or corporation to conduct a private business cannot be regarded as a taking of private property by the government for public use. Although licensing provides some assurances that a

business will operate in accordance with lawful standards, and the public presumably derives a benefit therefrom, the issuance of a license does not in any way grant the public a right of use in the property. Similarly the alleged failure of the DNR to properly supervise and regulate the disposal operation cannot be regarded as a taking of private property by the government for public use.

Secondly, the state's alleged misfeasance in licensing and supervising the operation does not constitute "affirmative actions directly aimed at the property". Thus, under *Heinrich,* the inaction and omissions by the state cannot be found to constitute a "taking".

C. Other Claims.

Counterplaintiffs also raise two new tort theories of recovery on appeal. They contend that the state damaged their property during the cleanup. They allege on appeal that the state "converted" their property "into rubble, an intentional tort" within the governmental immunity exception. They also allege for the first time on appeal that to the extent that damage to the property occurred from the operation, loading and unloading of "hi-los" and other heavy equipment, the motor vehicle exception to governmental immunity provides for relief under MCL 691.1405; MSA 3.996(105). Neither claim was pled in the counterclaim and is not preserved in this appeal.

VI. Summary of Disposition

We affirm the trial court's dismissal of the counterclaims against the state by Boratan Company, Tann and Boraks. We reverse the trial court's dismissal of plaintiffs' claims against the defendants and remand for the continuation of trial in

conformity with this opinion. Trial should recommence at the point where plaintiffs have completed their proofs and defendants' motions have been denied. We are aware that this opinion interprets the Fire Prevention Code in ways that may not have been anticipated by the trial court and counsel. Therefore, the trial court should have wide latitude in exercising its discretion to allow amendments to the pleadings and additional discovery. Whether plaintiffs should be permitted to reopen proofs in light of this opinion is a matter to be addressed to the sound discretion of the trial court.

Affirmed in part, reversed in part and remanded for further proceedings.