**Jerry E. MILLER, Plaintiff,**

v.

**UNITED STATES of America, DEPARTMENT OF THE INTERIOR, Defendants.**

**No. G83–724 CA7.**

United States District Court, W.D. Michigan, S.D.

Nov. 20, 1986.

Thomas L. Phillips, Walton, Smith, Phillips & Dixon, Traverse City, Mich., for plaintiff.

John A. Smietanka, U.S. Atty., by Julie Woods, Ass't U.S. Atty., Grand Rapids, Mich., for defendants.

## OPINION

HILLMAN, Chief Judge.

This action was brought by plaintiff, Jerry Miller, against defendant, United States of America, under the Federal Tort Claims Act to recover damages for personal injuries plaintiff sustained on August 5, 1980 when he jumped or fell from a rope swing into the Platte River in Sleeping Bear Dunes National Lakeshore Park, a national park located in northwest Michigan.

Sleeping Bear Dunes National Lakeshore Park was authorized by Congress in 1970. 84 Stat. 1075, 16 U.S.C. § 460x *et seq.* Consisting of approximately 71,000 acres of land and water along Lake Michigan, the park is noted for its scenic beauty. It is open to the public free of charge. Much of the park is undeveloped with forests and fields left substantially in their natural con-

dition. There are many miles of lakes, streams, and shoreline of Lake Michigan within the park's border.

The purpose of the act creating the park is stated as follows:

"Be it enacted by the Senate and House of Representatives assembled, That (a) the Congress finds that certain outstanding natural features, including forests, beaches, dune formations, and ancient glacial phenomena, exist along the mainland shore of Lake Michigan and on certain nearby islands in Benzie and Leelanau Counties, Michigan, and that such features ought to be preserved in their natural setting and protected from developments and uses which would destroy the scenic beauty and natural character of the area. In order to accomplish this purpose for the benefit, inspiration, education, recreation and enjoyment of the public, the Secretary of the Interior (hereinafter referred to as the 'Secretary') is authorized to take appropriate action, as herein provided, to establish in the State of Michigan the Sleeping Bear Dunes National Lakeshore. In carrying out the provisions of this Act, the Secretary shall administer and protect the Sleeping Bear Dunes National Lakeshore in a manner which provides for recreational opportunities consistent with the maximum protection of the natural environment within the area."

16 U.S.C. § 460x.

Since 1970 the National Park Service has acquired the property comprising the park through purchases and condemnation of property held by the State of Michigan, local government bodies and private parties.

The incident in question occurred in the park on the Platte River which is located in Benzie County, Michigan. Within the park the river is five miles long and flows in a northwesterly direction emptying into Lake Michigan. The river has a relatively slow current allowing upstream canoeing.

There are numerous homes and summer cottages along the river. Many are still privately owned with the owners holding life estates or long term leases with the National Park Service.

No fee is charged by the National Park Service for access to the Platte River or any other portion of the park except for a rental fee for camping in designated campgrounds within the park. A few public access points exist along the river bank. One such access point is the mouth of the river at Lake Michigan. At this access point there is a roadway and boat launching ramp maintained by Benzie County.

The site where plaintiff's accident occurred is approximately one quarter mile upstream from the access point just discussed. The site is at a bend in the river. The river is considerably wider at this point because of the bend. On one side of the river are privately owned homes. On the other side is a sandy beach where boaters frequently stop to picnic and sunbathe.

Plaintiff, age 19 and his female companion, on August 5, 1980, were canoeing on the Platte River and stopped at this sandy area. The river at this point created a small bay or cove. Directly across from the sandy picnic area is a bluff, covered primarily with shrubs and trees including an oak tree close to the bluff's edge. On the branch of this tree which projected out over the cove in the river, hung a long rope with a wooden horizontal handle attached at the end. The origin of this particular rope swing is unknown, although apparently either this swing or similar swings have been at this location off and on for many years. The rope was used by the general public to swing away from the bluff, out over the river and one would then drop into the river where the depth was somewheres around 6 to 7 feet. From where plaintiff and his friends were picnicking, plaintiff could look across the cove and see people swinging off the bluff and dropping into the river. He, himself, on numerous prior occasions had used the swing in the same manner. On this particular day after eating some chips and pop, and after having one "rum and coke", given to him by a friend, plaintiff swam across the cove to the bluff in question. At the time, there

may have been as many as fifteen people using the swing. A line had formed made up of families, young and old, as well as others. Plaintiff testified he made fifteen to twenty "jumps" before he was injured. He estimated that it was his practice to swing out eight to ten feet, then let go of the swing. He entered the water feet first after an approximate ten foot drop. The water was estimated by plaintiff to be six to seven feet deep at the point of entry: "Over my head." It was his practice to go straight down into the river until his feet were on the bottom, then push off and return to the surface. On each occasion he experienced no difficulty, nor did any of the other participants. On his last swing/jump something unexpected and unexplainable occurred. When he let go of the rope swing over the river he apparently was off balance. Plaintiff was unable to explain precisely what happened. He conjectured he may have held the bottom of the swing too long or perhaps released one hand earlier than the other. Admittedly the swing did not break. Plaintiff struck the water off balance then hit the bottom of the river, fracturing his neck, resulting in total paralysis of his legs and severe impairment of his arm. The injuries and their consequences are permanent.

Although the park was established by Congress in 1970, the property where the plaintiff was injured was not transferred to the defendant until April 13, 1979. The park continued to grow each year as adjoining properties were purchased. Likewise, the use of the property also grew. On August 7, 1980 there were 10,887 campers, 8,460 swimmers and 7,303 canoers and boaters.

With respect to the swing itself, the parties have stipulated that during the summer season of 1979, between the months of May and September, William May, a Ranger employed by the defendant observed a rope swing hanging over the Platte River at the location of Jerry Miller's accident. Ranger May made no attempt to remove the swing or take any other steps to investigate the scene or the surroundings after he was aware of the existence of the rope

swing. May did not report his observations of the swing to any other park employees or administrators until after he heard about the accident involving Jerry Miller. Ranger May did not work at the Platte River area of the Sleeping Bear Dunes Park after September 1, 1979.

In addition, although the parties disagree concerning the dangers inherent in a rope swing on the edge of the river, two park rangers testified by deposition that this type of swing at this location constituted a safety hazard to park visitors who might use the swing. On the other hand, plaintiff who at the time was nineteen (19) years of age, a good athlete, and who in fact lived on the river for many years did not consider the rope dangerous nor did he consider it a threat to the safety of the public. In addition, an elderly neighbor, James Benton, testified the cove was referred to by neighbors as the "rope hole" for many years. He testified his own children used the rope swing and according to him, "it looked safe to me."

The case was tried to the court without a jury on April 15 and 16, 1986. Final arguments were held on July 30, 1986 and post trial briefs were submitted by the parties. The following constitutes the court's finding of fact and conclusions of law in accordance with Federal Court Rule 41.

Suit was filed under the Federal Tort Claims Act 28 U.S.C. § 2671, *et seq.* The court has jurisdiction under 28 U.S.C. § 1346(b).

In a suit filed under the Federal Tort Claims Act, the United States is to be considered and judged as a private person subject to the law of the place where the accident occurred, which in this case is Michigan. The State of Michigan at the time of this accident had adopted what is known as the Michigan recreational use statute, M.C.L. § 300.201; M.S.A. § 13.-1485. An important and initial question in this case is whether this statute is applicable to the Sleeping Bear Dunes National Lake Shore Park. The statute reads as follows:

"No causes of action shall arise for injuries to any person who is on the lands of another without paying to such other person a valuable consideration for the purpose of fishing, hunting, trapping, camping, sightseeing, motorcycling, snowmobiling, or any other outdoor use, with or without permission, against the owners, tenant, or lessee of said premises unless the injuries were caused by the gross negligence or willful and wanton misconduct of the owner, tenant or lessee." M.C.L.A. 300.201.

Plaintiff claims the recreational use act does not apply to federal owned properties such as Sleeping Bear Dunes Park. First he argues the statute is applicable only to licensees, not public invitees such as invited park visitors. Secondly, the statute is intended to make property otherwise closed to the public available for recreational purposes, and thirdly, the recreational use statute must be read in *pari materia* with the Michigan Public Health Code. When so read, argues plaintiff, it is apparent the Recreational Use Statute should not apply to parks offering camping and swimming areas to public invitees encouraged to use these areas.

The park service on the other hand, asserts that the standards of the recreational use statute are applicable to Sleeping Bear Dunes National Lakeshore because governmental entities, including the United States, should also be encouraged to hold their lands open to the public for the use and enjoyment of the public without exposure to liability under simple negligence. Additionally, the Tort Claims Act requires that the United States be treated the same as a private individual.

A review of Michigan law discloses a number of cases which in fact have applied the act to recreational land operated by governmental bodies. See *Graham v. Gratiot*, 126 Mich.App. 385, 337 N.W.2d 73, 75 (1983); *Burnett v. City of Adrian*, 414 Mich. 448, 326 N.W.2d 810 (1982) and *Syrowik v. Gratiot*, 119 Mich.App. 343, 326 N.W.2d 507 (1982).

Recently the recreational use statute has been applied to state owned land in *McNeal v. Mich. Dept. of Natural Resources*, 140 Mich.App. 625, 364 N.W.2d 768 (1985) wherein the court states "... we see no valid reason to distinguish state owned land from land owned by the local government ..." 364 N.W.2d at 771.

Similar landowner liability statutes or recreational use statutes have been applied to the National Park Service or National Forest lands in other districts. *See Ewell v. United States*, 579 F.Supp. 1291 (C.D.Utah 1984), *aff'd* 776 F.2d 246 (10th Cir.1985); *Von Tagen v. United States*, 557 F.Supp. 256 (N.D.Cal.1983); *Ducey v. United States*, 713 F.2d 504 (9th Cir.1983); *Gard v. United States*, 594 F.2d 1230 (9th Cir.1979), *cert. den.* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90; *Otteson v. United States*, 622 F.2d 516 (10th Cir.1980); *Mary A. Clem v. United States*, 601 F.Supp. 835, *aff'd. on rehrg.*; 603 F.Supp. 457 (N.D.Ind.1985); and *Cameron Smith v. United States*, 546 F.2d 872 (10th Cir.1976).

In an unreported case in this district, the recreational use statute was applied to property owned by the National Guard which had been made available to National Guard personnel for recreational purposes. *See Ted Alan Stephan v. United States of America*, United States District Court for the Western District of Michigan, Case No.: K75–506 CA (1982), decided January 20, 1982 by Judge Gibson [Available on WESTLAW, DCTU database].

■ In view of the Michigan cases, I am satisfied the plaintiff is in error when he claims that the recreational use statute does not apply to government land. Applying the statute to government lands is consistent with the language of the Tort Claims Act which specifically requires that the United States be held to the same standard as a private citizen. Clearly if these 70,000 acres of vacant, large, undeveloped land had been owned by a private person, the Michigan recreational use statute would hold that person liable for injuries to others lawfully on his property, only if the owner was guilty of gross negligence and/or willful and wanton misconduct.

Plaintiff further argues that he was a "public invitee" and as a result afforded the same degree of care as a "business invitee" citing *Preston v. Sleziak*, 383 Mich. 442, 175 N.W.2d 759 (Mich.1970). Plaintiff then concludes the recreational use statute is inappropriate to public invitees citing *Thomas v. Consumers Power Co.*, 394 Mich. 459, 231 N.W.2d 653 (1975). That is not how I read *Thomas*. In that case, two snowmobilers were killed when they ran into a guy wire at night when operating their snowmobile owned by the Saginaw County Agriculture Society. This property was commonly referred to as the "fair grounds" and the owners had for many years permitted snowmobiles to be operated on the premises as a recreational activity. The court held that by virtue of the statute, plaintiffs, being on the defendants property for recreational purposes, and without consideration had no cause of action against the defendant arising from ordinary negligence. In *Preston* the court struggled with defining the status of social guests. That is clearly not this case. In *Thomas* the Court classified the snowmobilers as licensees and held the statute a bar. In *Thomas* as in the case at bar, plaintiffs were on the property of another with the consent of the owner. The purpose of the statute is to encourage private owners as well as governmental entities, including the United States, to hold their lands open to the public for the use and enjoyment of the public without exposure of liability for ordinary negligence. I am satisfied the recreational use statute is available to the government in this case and bars plaintiff's recovery in the absence of proof of gross negligence or willful and wanton misconduct.

Plaintiff further argues that the recreational use statute does not apply because he was a public invitee on defendant's property. He points out that two Michigan cases, although admittedly dicta, have interpreted the intent of the legislature in enacting the recreational use statute as merely codifying the common law obligations of property owners to licensees. *See Thomas, supra; Crawford v. Consum-*

*ers Power Company*, 108 Mich.App. 232, 310 N.W.2d 343 (1980). However, it should be noted that plaintiff in the present case had the same status as the plaintiffs in *Stephan, supra; McNeal, supra* and *Syrowik, supra,* where the recreational use statute was held to apply. Consequently, plaintiff's status does not preclude application of the statute.

Also, plaintiff maintains that the recreational use statute should be read in *pari materia* with the Michigan Public Health Code. The Health Code provides that public campgrounds must be licensed by the state. M.C.L.A. § 333.12506. The licensing requirements include a safety inspection by the Michigan Department of Health of all bathing beaches. Although the Health Code does not apply to the federal government, plaintiff contends that since the government is to be treated as an individual under the Federal Tort Claims Act, the government's failure to have the beach inspected should be considered a violation of the Health Code.

I am satisfied however, that the Michigan Public Health Code does not apply to this case. First, the sandy area along the Platte River was not a bathing beach. As defined in the Michigan Administrative Code a bathing beach is "a beach and bathing area offered to the public for bathing or swimming." R 325.2101. Although swimming was permitted in this area, the government did not hold it out as a designated beach. As the pictures which were offered as exhibits demonstrate this accident occurred near a bluff covered with shrubs and trees and was clearly not a designated beach for swimming. In addition, there was no easy access to this particular area by land. Also as pointed out, the accident did not occur at the sandy area where canoes and picnickers pulled up, but rather further downstream. Consequently, even if the sandy area had been inspected and all hazards removed at that location, plaintiff's accident still would have occurred. Finally, the Health Code applies only to bathing beaches at campgrounds.

Since the park's campground and the sandy area were two miles apart, the Health Code is inapplicable.

■ Has plaintiff proved by a preponderance of the evidence facts to support the claim of gross negligence or willful and wanton misconduct? It is undisputed that a rope swing had been in existence on this particular tree for a long period of time. There is also evidence the swing had been observed by at least one of the rangers and he had taken no action to remove it. One of the rangers stated in his deposition that the existence of the swing, at least in his judgment constituted a safety hazard and should have been removed. Do these facts constitute gross negligence or willful and wanton misconduct under Michigan law? I think not.

■ First of all, gross negligence includes the concept of subsequent negligence. *Burnett v. City of Adrian*, 326 N.W.2d 810 (Mich.1982). Here the acts or failure to act by defendant occurred prior to the time plaintiff entered the park on August 5, 1980, and therefore, those acts or failure to act do not constitute proof of last clear chance or subsequent negligence. Consequently, plaintiff has failed to prove gross negligence.

What is or is not willful and wanton misconduct under Michigan law is far from clear. The pronouncements of Michigan's appellate judiciary concerning the concept of gross negligence and willful and wanton misconduct has been "confused and disparate". *Burnett v. City of Adrian*, 326 N.W. 2d 810 (Mich.1982). The Michigan Supreme Court is apparently split over the interpretation of the three (3) elements generally acknowledged to determine in Michigan whether under any given set of facts, willful and wanton misconduct does not exist.[1]

The majority insists that under the rule, willful and wanton misconduct is established only if the conduct shows an intent to harm or at least such indifference as to whether harm will result as to be the equivalent of a willingness that it does. *Burnett, supra,* 812. Three of the judges specifically approved the test in *Gibbard v. Cursan,* 225 Mich. 311, 196 N.W. 398, and in response to the claim that the test is only a higher negligence test say, "It is the additional element of the recognition that failure to exercise ordinary care would have dire consequences that describes the reckless behavior which distinguishes willful and wanton misconduct from negligence."

I am satisfied that in the present case, under either view, no willful or wanton misconduct by park officials has been proved. The existence of the swing was obvious to all. The plaintiff himself, an active, athletic young man, who had lived on the river, and was an accomplished swimmer had used the swing on many occasions during the preceding year; he knew the depth of the water; he knew how far he had to fall before striking the water and then how far he could go down into the water before striking the bottom. All the physical conditions surrounding this particular rope swing were known to him. There were no hidden defects, either known or that should have been known by the park officials, not known to the general public. By his own testimony, plaintiff stated that on the day of the accident there was a line up of people waiting to use the swing, (men, women and children) and that he, himself, jumped from the swing fifteen to twenty times without incident. This swing obviously did not appear dangerous or present any threat to the many ordinary people who came to the park for recreational purposes and who in fact were using the swing. The ranger who testified that in general rope swings constitute a hazard did not state how or in what manner they are hazardous, or to whom. The obvious hazard, it seems to me, is for a young child

---

**1.** " '(1) Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; (3) the omission to use such care and diligence to avert the threatened danger, when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.' " *Gibbard v. Cursan,* 225 Mich. at 322, 196 N.W. 398.

who can't swim to swing out over the water, lose his grip, and then fall. That is a far different situation than what happened to Mr. Miller. There is no way in my judgment that a careful, prudent, safety conscious ranger coming upon a scene where twenty people more or less, are standing in line waiting a turn to swing out and drop into approximately six or seven feet of water would or should conclude that what they were doing, "would likely prove disasterous." I do not believe that the failure to remove the swing was equivalent to an indifference to harm or injury that might occur to these people. At most, the ranger may have been guilty of ordinary negligence in failing to anticipate a potential injury to someone using the swing and then failing to remove it. But as pointed out earlier, the government is not liable for ordinary negligence of its park employees.

Finally plaintiff alleges that the rope swing constituted an intentional nuisance in fact; that is, where "the natural tendency of the act is to create danger and inflict injury on person or property." If this means a nuisance can be created merely by negligent conduct then this case under Michigan Law should be treated as a negligence action. *Young v. Groenendal* 382 Mich 456, 169 N.W.2d 920 (1965). As previously pointed out negligence claims in this case are barred by the recreational use act. But I am satisfied that a claim of nuisance is more than negligence. By definition an intentional nuisance in fact requires an intent absent in negligence claims. As recently stated:

> "To establish the necessary intent, a plaintiff must show that the defendant who created or continued the nuisance knew or must have known that harm to the plaintiff was substantially certain to follow as a result of defendant's actions."

(citations omitted) *Jenkins v. Detroit,* 138 Mich.App. 800, 360 N.W.2d 304 (1985).

Plaintiff relies upon *Taggie v. D.N.R.,* 87 Mich.App. 752; 276 N.W.2d 485 (1979) and *Veeneman v. State of Michigan,* 143 Mich.App. 694, 373 N.W.2d 193. In *Teggie,* the defendant knew previous rock slides had occurred in the same area and that future rock slides would occur but took no steps to protect the public. Likewise, in *Veeneman,* involving a dunebuggy roll-over death, it was alleged defendant knew of previous deaths and injuries of a similar nature in the area yet failed to take appropriate safety measures. In the present case there was no evidence defendants knew or should have known that harm was substantially certain to follow by not removing the rope swing. No evidence was offered that at any time defendant knew or should have known that anyone else had ever been injured on this particular rope swing or on any other rope swing in any of the national parks. There was a total lack of proof to bring this case within the classification of an intentional nuisance in fact.

It being the finding of the court that defendant is not liable to plaintiff for the latter's injuries and damages sustained in this unfortunate accident, judgment shall be entered for defendant of no cause for action. Each party shall bear its own costs.