Lawrence M. WEAVER, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. 90–72973.

United States District Court, E.D. Michigan, S.D.

Dec. 18, 1992.

Jeffrey Cohen, Detroit, MI, for plaintiff.

Elizabeth J. Larin, Asst. U.S. Atty., Detroit, MI, for defendant.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I.

This is a personal injury action brought pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.* Plaintiff, Lawrence Weaver (Weaver), was severely injured in a diving accident while swimming in the Pine River where it is crossed by Low Bridge Road in the Manistee National Forest in Manistee County, Michigan.[1] Weaver claims that the United States of America (the Government)[2] in the person of the United States Forest Service (Forest Service) was negligent in maintaining the area of the Pine River at the point where Low Bridge crosses it (Count I); that the Government created, maintained and failed to warn of a nuisance (Counts II, III, and IV), that the Government committed an intentional tort on Weaver (Count V), and the Government engaged in willful and wanton misconduct (Count VI). Further, Weaver claims that the Government is liable for his injuries because the Low Bridge area constitutes a "developed area" (Count VII), because the Government provided information regarding the Pine River

---

1. The Pine River, the river bank and the land on either side of the river at the point where Low Bridge crosses the river are hereinafter referred to as "the Low Bridge area". The bridge crossing the river is hereinafter referred to as "Low Bridge". "Low Bridge Road" refers to that portion of Low Bridge Road which crosses the river via Low Bridge. The cleared area used for parking adjacent to the Low Bridge area is hereinafter referred to as the "parking area".

2. The responsible agency is the United States Forest Service, a division of the Department of Agriculture.

but failed to provide information on diving and swimming (Count VIII), and because the Government is the possessor of the land (Count IX). Now before the Court is the Government's motion for summary judgment. For the reasons stated below, the motion is GRANTED. This case is DISMISSED.

## II.

### A.

On June 14, 1987, Weaver and fifteen friends were completing a three day weekend canoe trip down the Pine River. They rented their canoes from a private livery. The group canoed that morning and stopped around noon for lunch. During the morning and lunch hours the group, Weaver included, drank some beer and liquor and smoked some marijuana. After lunch, Weaver slept in his canoe while his brother paddled. Around 2:00 or 3:00 p.m. the group arrived at the termination point of the trip, Low Bridge. Weaver woke up. He got out of the canoe close to the shore and stepped into about ankle or knee deep water. He and his brother pulled the canoe out of the water.

Weaver saw several persons swimming in the river. He observed a man standing in water about chest high approximately twenty feet from shore. The Pine River was about one hundred feet wide at the location. Weaver climbed onto Low Bridge over the river and dove into the river with his hands out in front of him. Upon entering the water, the top of his head or his forehead hit something in the water or the bottom of the river. He blacked out and was pulled from the river by his friends. He regained consciousness and was transported by ambulance to a hospital where it was determined that he had broken his back.

Prior to the canoe trip, Weaver had successfully completed several water safety courses including advanced lifesaving and life guard training. In addition, he had worked as a lifeguard and had passed the water safety instructor test although he never worked as an instructor.

### B.

The Pine River, which flows in a northwest direction, is frequently used by canoeists. Four separate canoe landings are located along the relevant stretch of the river. Low Bridge is one of the four landings and it is located northwest of the other three canoe landings: (1) Peterson Bridge, (2) Elms Flat, and (3) Dobson Bridge. Peterson Bridge is the canoe landing closest to Low Bridge; Elms Flat and Dobson Bridge are farther upstream from Low Bridge Road. A significant percentage of canoeists launch their canoes at either Elms Flat, Dobson Bridge or Peterson Bridge and end their trips at Low Bridge. The canoe landings have picnic areas, parking lots, rest rooms, and other facilities. The Low Bridge area has a cleared space used for parking, a garbage can, a sandy deposit on the left bank and a steep bank to the right. Low Bridge Road, a single road, runs across the river on a bridge the bottom of which is only a few inches above the water.

The exterior boundaries of the Cadillac District of the Huron–Manistee National Forest delineate some 200,000 acres of land. At the time of Weaver's accident approximately 125,000 acres were owned by the Government and approximately 75,000 were privately owned. All four of the canoe landings are within the boundaries of the National Forest. However, at the time of Weavers injury, the land surrounding and underlying the river at Low Bridge up to a point one mile upstream (east) was owned by the Consumers Power Company (Consumers Power).[3] The USA was not responsible for the maintenance of the Low Bridge Road or Low Bridge as they were constructed, owned and maintained by the Manistee County Road Commission. The Government owned the land surrounding and underlying the river at Peterson Bridge, Elms Flat and Dobson Bridge. At

---

**3.** Consumers Power acquired the land from Michigan Railway Company in 1917. On September 28, 1988, Consumers Power sold the land to Caberfae Skiing Company and it was acquired by the United States in October, 1988 in a land exchange.

Peterson Bridge, the government posted a sign stating the distance and float time to the Low Bridge.[4]

Along the 25 miles of the Pine River upstream from Low Bridge, there are thirty to forty privately owned small lots with houses or cabins on them. The lots were sold by Consumers Power in the mid 1960's, as was substantial acreage sold to the United States. The deeds to the small lots each contain restrictive covenants which prohibit commercial operations on the land. No such restriction exists in the deed to the Consumers Power land in or adjacent to the Low Bridge area.

### C.

The Government published a recreation opportunity guide (ROG) which, among other things: (1) described many of the Pine River's physical characteristics, (2) listed regulations applicable to canoeists who use the river, (3) informed the public how to obtain the permits which are required to canoe on the river, (4) gave directions to the three canoe landings that are located on property owned by the Government, and (5) had a map of the river. In its only two explicit references to the Low Bridge canoe landing, the ROG stated: (1) "Consumers Power Co. has one landing downstream at Low Bridge," and (2) the float time and distance from Peterson Bridge to Low Bridge. The ROG did not address swimming or diving in the river in general or at Low Bridge, specifically, however, it cautioned that the average depth of the River was 2.2 feet but some pools were eight feet deep.

The National Forest Service had in effect two closure orders pertaining to the Pine River at the time of the accident. The orders apply only to land along the river owned by the National Forest Service at the time the order was issued. No order was ever issued which applied to the river itself. The first closure order, issued during the 1960's or 1970's, restricted camping within one quarter mile of the river. The

second closure order issued in 1977, restricts public launching or retrieving a watercraft on National Forest land except at designated landing sites and a permit is required. The permits are issued by the National Forest Service by mail or at the Cadillac District Ranger Office. Canoe rental liveries issue permits to those renting canoes. There is no fee for the permit. A permit was not required in order to launch or retrieve a boat at Low Bridge. Pursuant to a Special Use Permit issued by the National Forest Service, seven private canoe liveries are permitted to rent canoes launched or retrieved on National Forest land.

### III.

■ The government's liability under the FTCA is determined in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b); *Frazier v. United States*, 412 F.2d 22, 23 (6th Cir. 1969). Here, since the injury and alleged tortious conduct occurred within the State of Michigan. Therefore, the substantive law of Michigan applies.

### A.

The Government first contends that the Michigan Recreational Use Act (RUA), M.C.L.A. § 300.201; M.S.A. § 13.1485, bars Weaver's recovery in the absence of gross negligence or willful and wanton misconduct. Further, the Government claims that the RUA bars Weaver's nuisance claims. In response, Weaver argues that the RUA does not apply to this case but if the Court determines that it does, the Government's actions constitute willful and wanton misconduct so as to remove the action from the scope of the Act.

The RUA provides in relevant part:
[N]o cause of action shall arise for injuries to any person who is on the lands of another without paying to the owner, tenant, or lessee of the lands a valuable consideration for the purpose of fishing, hunting, trapping, camping, hiking,

---

**4.** There was no sign marking the boundary between the land owned by the Government and the land owned by Consumers Power.

sightseeing, motorcycling, snowmobiling, or any other outdoor recreational use, with or without permission, against the owner, tenant or lessee of the land unless the injuries were caused by the gross negligence or willful and wanton misconduct of the owner, tenant, or lessee.

 The statute is intended to apply to large tracts of undeveloped land suitable for outdoor recreational uses. *Wymer v. Holmes,* 429 Mich. 66, 412 N.W.2d 213 (1987). Urban, suburban, and subdivided lands were not intended to be covered by the RUA. *Id.* The RUA has been found applicable to governmental agencies, including the United States. *Miller v. United States Dept. of Interior,* 649 F.Supp. 444 (W.D.Mich.1986).[5] The Act is not concerned with ownership. Rather, its focus is on the injured person's purpose for going on the land and the character of the land, i.e., whether it remains in a relatively natural state or has been developed and changed in a manner incompatible with the intentions of the Act. *Wilson v. Thomas L. McNamara, Inc.,* 173 Mich.App. 372, 377, 433 N.W.2d 851 (1988). Ownership by the defendant of the precise land on which a plaintiff is injured is not required so long as the injuries suffered by a plaintiff were proximately cause by a plaintiff's use of defendant's land. *James v. Leco Corp.,* 170 Mich.App. 184, 427 N.W.2d 920 (1988).

 Weaver contends that the RUA is not applicable because the land on which he was injured was developed land and, therefore, outside the RUA's scope. The court in *Judd v. United States,* 650 F.Supp. 1503, 1507 (S.D.Cal.1987), in determining whether a site was developed examined the Forest Service Manual which defines a developed recreation site as follows:

> Existing development (developed) sites consist of modifications to enhance recreational opportunities, in addition to the land, water, and vegetation ...
>
> There is no specified kind, number, arrangement or cost of facilities which determine the existence of a developed site.

This determination is based on the management in instituting the site modification. As a general rule, however, a developed campground will usually include a toilet, garbage containers, fireplaces or fire rings in grates or stoves, a campground sign, and a bulletin board or poster board. Other developed site kinds will have similar degrees of development.

> ... The following criteria are useful in making such determinations:
>
> 1. A developed site has been modified to accommodate one or more specific recreation opportunities for intensive rather than dispersed uses and is one of the site kinds listed in the first paragraph above. Modification must include facility installation.
>
> 2. At developed site the modifications are to enhance recreation opportunities, and not merely those need for resource protection or to satisfy administration needs.
>
> 3. Developed sites are documented by approved site designs (FSM 2330.3).
>
> 4. For developed sites it is desirable to publish locative and other site information in directories and on maps to help people find the site and to encourage continued or additional use.
>
> ... the development site consists of the actual developed area and also the peripheral area surrounding the developed area.
>
> This peripheral area is an integral part of the development site on which modified land management practices are required in order to preserve environmental characteristics.

Forest Service Manual § 2330.5.

Weaver also relies on *Soto v. United States,* 748 F.Supp. 727 (C.D.Cal.1990) in which the court ruled that the area in question constituted a developed area because of the close proximity of a large parking lot, an improved picnic area, a nearby campground, and Forest Service housing. Here, Weaver says the Low Bridge area was developed because there was a large

---

5. *See also, Ewell v. United States,* 579 F.Supp. 1291 (D.Utah 1984), *aff'd* 776 F.2d 246 (10th Cir.1985) and *Ducey v. United States,* 713 F.2d 504 (9th Cir.1983).

parking lot in close proximity to the River, there was a large waste receptacle there, and because it is well established that the Low Bridge area is the termination spot of many three day canoe trips.

The Government contends that the area in which Weaver was injured is an undeveloped stretch of the Pine River located far from urban areas. It denies that there was a large parking lot. The space to which Weaver refers was cleared during construction or other maintenance work. It was not designed to be a parking lot but, in fact, canoeists have used it for that purpose. The parking area can accommodate only ten to twelve cars. Further, the government offers the affidavit of the District Ranger Thomas V. Lea (Ranger Lea), the Forest Service ranger at the time of the injury, who stated that the Low Bridge area was not a developed National Forest recreation site.

The government distinguishes *Soto* on several bases. It notes that the land the plaintiff in *Soto* was injured on bordered the City of Los Angeles and was unlike a remote wilderness area. The court said it was more like a city park than a non urban forest. *Soto* at 728, 731. Further, the area in which the *Soto* plaintiff was injured had a parking lot holding 70–100 vehicles, an improved picnic area, Forest Service housing and a residential subdivision.

The Court is satisfied that the Low Bridge area is not a developed site. The Low Bridge area is far from any urban areas and exists in its natural state. No campgrounds, cooking facilities, fire rings, picnic areas, rest rooms, or boat launches are in close proximity. Further, Weaver has not offered an approved site design nor any other evidence that the Forest Service deemed the Low Bridge area developed. Ranger Lea testified that the Low Bridge area was not considered a developed site under the Manual. The fact that a number of canoeists used that point to terminate their canoe trips and that a cleared space was used for parking is insufficient to constitute a developed area. Weaver has offered no other evidence to support his contention. Accordingly, the RUA is applicable.

## B.

Weaver next contends that if the RUA is applicable, then the activities complained of rise to the level of willful and wanton conduct so as to remove them from the scope of the statute.

While much dissatisfaction has been expressed by the courts in Michigan with regard to the definition of willful and wanton misconduct, the majority view is that three elements must be satisfied in order to find willful and wanton conduct. *Miller* at 450. They are:

1. Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another;

2. The ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; and

3. The omission to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.

*Gibbard v. Cursan*, 225 Mich. 311, 322, 196 N.W. 398 (1923). Weaver contends that the Forest Service knew or should have known that canoeists often swam at the Low Bridge area and that it should reasonably be expected that canoeists would swim at the end of their canoe trip. Its failure to make the Low Bridge area safe, to post warning signs, include warnings in the ROG, and to provide life guards, and take other precautionary measures, Weaver contends, constituted willful and wanton conduct.

The Government responds that it had no duty to warn or safeguard the Low Bridge area because it did not own the land. However, the Government contends, if a duty to Weaver is found, the failure to discharge that duty amounts only to negligence, not willful and wanton conduct. In support, the Government points to a series of cases decided by the Michigan courts under which a failure to post warning signs or to erect barriers or fences failed to meet the *Gibbard* test. *See, Montgomery v. De-*

*partment of Natural Resource,* 172 Mich. App. 718, 721–722, 432 N.W.2d 414 (1988) (failure to design, maintain, plow and post warnings on snowmobile trail); *Hill v. Guy,* 161 Mich.App. 519, 411 N.W.2d 757 (1987) (failure to fence off or post warning signs near pond or defendant's land); *Yahrling v. Belle Lake Association,* 145 Mich.App. 620, 378 N.W.2d 772 (1985), reversed on other grounds *sub nom., Wymer v. Holmes,* 429 Mich. 66, 412 N.W.2d 213 (1987); *Matthews v. City of Detroit,* 141 Mich.App. 712, 717–719, 367 N.W.2d 440 (1985) (failure to erect fences or barrier, post warnings or drain lagoon around Belle Isle's Scott Fountain); *Miller v. United States, supra* (failure to remove rope swing of which federal officials were aware).

The Government also says that its conduct was not willful and wanton because it had no knowledge that canoeists were swimming in the river at the Low Bridge area. Ranger Lea, in his deposition, stated that neither he nor his employees had ever seen nor had they heard of people swimming in the river at the Low Bridge area. Since it had no knowledge of the situation, the government argues, the first prong of the *Gibbard* test is not met. The government also contends that Low Bridge and the Pine River are not inherently dangerous and do not present a threat to most people who come in contact with them. Therefore, it argues, it would not be apparent to an ordinary mind that the result of failing to take the measures alleged by Weaver in Count VI would prove disastrous to another.[6] Further, the government contends that Weaver has not established facts sufficient to show that the government had an intent to harm or that the injury was so probable that indiffer-

ence to harm was tantamount to a willingness for it to occur. *Matthews,* 141 Mich. App. at 718, 367 N.W.2d 440. The allegations as set forth in Count VI, it says, merely restate the negligence allegations in Count I adding allegations that the defendants recklessly disregarded plaintiff's safety and allegations that paraphrase the *Gibbard* test. Yet, the Government says, that the facts alleged in Weaver's negligence claims and in his willful and wanton misconduct claims are the same. These allegations and facts are of negligence and are barred by the RUA pursuant to the above cited case law.

### C.

The Court is satisfied that on the record as it stands, Weaver has not established facts sufficient to raise a question that the Government's actions were anything but negligent. Weaver has failed to provide any evidence to refute Ranger Lea's testimony that the Forest Service did not know swimming and diving was taking place at the Low Bridge area. As such, the first prong of the *Gibbard* test, knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury is not met. Nor is the third prong of the test met as the failure to post warnings, to fence, or to provide other safeguards does not amount to willful and wanton misconduct. *Wilson, supra.* "Willful and wanton misconduct is qualitatively different from and more blameworthy than ordinary negligence or even gross negligence." *Burnett v. City of Adrian,* 414 Mich. 448, 462, 326 N.W.2d 810 (1982). As the Government notes, the failure by the Government to post warning signs or to otherwise take precautionary measures with regard to

---

**6.** In Count VI, those measures are: failure to fence; failure to warn; failure to make area fit for swimming; failure to perform periodic inspections of the land and water; failure to provide a lifeguard; failure to take precautionary measures because of the shape, structure, appearance and depth of the river; failure to create and mark a safe swimming area; failure to provide lighting; failure to post no diving signs; failure to mark the water's depth; failure to discover, remedy or warn of the defects; failure to exercise reasonable care with regard to construction and maintenance of the defective

bridge and river; failure to exercise a very high degree of care; impliedly misrepresenting the condition of the river and the bridge; failure to conform with existing statutes and ordinances; failure to reasonably perform activities necessary for the protection of the plaintiff upon which plaintiff detrimentally relied; failure to react in any manner to the hazard posed by the condition of the land, water and bridge; failure to abate the hazard of a rock-covered river bottom; intentionally failing to maintain the bridge and to remove rocks from the river bottom.

swimming and diving in the Low Bridge area does not meet the *Gibbard* test for willful and wanton misconduct.

Because the facts as established in Counts I, V, and VI only amount to negligence, they are barred by the RUA. Further, since the Court has determined in its analysis here that the Low Bridge area was not a developed site, summary judgment as to Count VII is appropriate.

### IV.

The Government next contends that Weaver's nuisance claims, Counts II, III, and IV, are barred on two bases: (1) by the RUA. and (2) because the Government did not have possession or control over the land adjacent to the Pine River where Weaver was injured. The Court first addresses the issue of possession and control.

### A.

■ Under Michigan law, liability for injuries allegedly resulting from the dangerous condition of land requires that the defendant have possession and control over the property at issue at the time of a plaintiff's injury. *Merritt v. Nickelson*, 407 Mich. 544, 552–52, 287 N.W.2d 178 (1980). Liability for nuisance is also based upon a dangerous, offensive or hazardous condition or activity on the land. *Buckeye Union Fire Ins. Co. v. Michigan*, 383 Mich. 630, 636, 178 N.W.2d 476 (1970). A defendant may not be found liable for a nuisance in the absence of the right to possession or control of the land on which the nuisance is located. *Attorney General v. Ankersen*, 148 Mich.App. 524, 560, 385 N.W.2d 658 (1986).

■ Here, there is no dispute that Consumers Power owned the land in question at the time of Weaver's injury. Nor is there a dispute that the Manistee County Road Commission owned Low Bridge and Low Bridge Road. The issue is whether the Government had possession and/or control over the property. There is simply no evidence in the record to suggest that at the time of Weaver's injury the government possessed or controlled Low Bridge Road, Low Bridge or the Low Bridge area.

### B.

In arguing that the Government exercised control over the Low Bridge area, Weaver says (1) it enforced a regulation requiring private canoe liveries located along the river to obtain special use permits, which contained certain operating conditions, and (2) the deeds to many privately owned plots of land contained restrictive covenants prohibiting significant alteration or modification without prior approval, which the Government routinely enforced. However, such special use permits and restrictive covenants are irrelevant because: (1) there is no evidence that the Low Bridge area was a canoe livery, and (2) the deed to the land owned by Consumers Power, including the Low Bridge area did not contain any restrictive covenants. Further, the use permits were only issued for those launching or retrieving canoes on Government owned property. If a canoeist desired to canoe on the Pine River without beginning or terminating his trip on Government property, he would not be required to obtain a permit. The Government has no authority over those canoeists nor does it have authority over those on private property. Accordingly, the Court is satisfied that the Government did not exercise control over the Low Bridge area.

### C.

In order to be considered a possessor of land a person must be: "(a) ... in occupation of the land with intent to control it or (b) ... in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or (c) a person who is entitled to immediate possession under Clauses (a) and (b). *Merritt*, 407 Mich. at 552, 287 N.W.2d 178. Again, there is no evidence to suggest that the Government had control or the right to control the land. Low Bridge Road and Low Bridge was owned and maintained by the Manistee County Road Commission and the Low Bridge area was owned by Consumers Power. There is no evidence that the Government occupied that land or that it had a right to immediate possession.

Therefore, the Government cannot be considered a possessor.

## D.

Since the Government was not a possessor nor was it in control of Low Bridge Road, Low Bridge, or the Low Bridge area, it is not liable for injuries which occurred due to the dangerous condition of the land or the hazardous activity conducted on it. Nor can the Government be liable for nuisance. Therefore, the Government's motion for summary judgment must be granted as to Weaver's claims of nuisance, Counts II, III and IV. In addition, since Count IX alleges that the Government had a duty to warn of dangers and hazards arising out of its status as possessor of the land and the Court has determined that the Government was not in possession or control of the land, the Government's motion must be granted as to Count IX as well.

## V.

### A.

Weaver next contends that the government owed a legal duty to warn him as to, among other things, the dangers of diving from Low Bridge (Count VIII). That duty, Weaver says, arose out the Government's voluntary assumption to provide information regarding canoeing down the Pine River. That information was contained within the ROG. Weaver contends that once the Government undertook to provide information with respect to the Pine River, it had a duty to provide information regarding the hazards and dangers including warnings against swimming and diving.

The Government first argues that this claim is actually a negligence claim and is therefore barred by the RUA. In support it relies on *Palmer v. United States*, 945 F.2d 1134, 1137 (9th Cir.1991) in which the Court of Appeals held that Hawaii's recreational use statute precluded other theories of liability based upon mere negligence. *Id.* at 1137. The alleged breach here is the failure to exercise reasonable care in undertaking to provide complete information about the Pine River and, the Government, contends amounts only to negligence.

Weaver relies on two cases, *Mandel v. United States*, 793 F.2d 964 (8th Cir.1986) and *Rhodes v. United Jewish Charities*, 184 Mich.App. 740, 459 N.W.2d 44 (1990). In *Mandel*, the plaintiff sustained serious injuries when he dove into a swimming hole in a river and struck his head on a submerged rock. The swimming hole was located on private property but the entire river was part of the National Park Service. The Court of Appeals for the Eighth Circuit held that "once the National Park Service chose to furnish information to its patrons about the entire [river], it had a concomitant duty to exercise reasonable care in doing so notwithstanding the private ownership of portions of adjoining land." *Id.* at 967. In *Rhodes*, the Court held that when a party voluntarily assumes to perform a duty, it is required to perform that duty in a non-negligent manner. Weaver says that since the Government undertook to provide information regarding the Pine River in the ROG, it had a duty to exercise reasonable care in doing so and that duty included providing information that warned of the dangers of diving into the Pine River from Low Bridge. By failing to provide that warning, Weaver says, the Government breached its duty.

### B.

The Court is satisfied that Count VIII states a claim for negligence and is therefore barred by the RUA. As the court in *Rhodes* stated, once a party voluntarily assumes to do something it must do it in a non-negligent manner. Here, the allegation is that the Government voluntarily assumed to provide information with respect to canoeing on the Pine River and it failed to fully perform in a non-negligent manner. As such, its failure to do so constitutes negligence. Whether or not the Government had a duty to provide information warning of the dangers of diving or swimming in the Pine River, its failure to include that information can only be characterized as negligent activity. Therefore, the action should be barred by the RUA.

As the court in *Klepper v. City of Milford,* 825 F.2d 1440, 1450 (10th Cir.1987), stated,

> The RUS itself is a statutory modification of the common law of torts and provides for no liability for simple negligence. Instead, it provides for liability only where conduct is willful or malicious or where consideration is given in return for use of the recreational facilities. If the Kansas legislature had wanted to provide for additional exceptions, such as liability for negligent inspections, it could have so stated. To rule otherwise would have the effect of defeating the purpose of the RUA.

The Michigan RUA does not restrict its application to negligence claims based on failure to take certain safety measures, nor does it except from its coverage claims of failure to warn. Accordingly, Weaver's claim of failure to warn falls squarely within the ambit of the RUA and is therefore barred.

The Court is also persuaded that the Government did not have a duty to provide information regarding swimming and diving in the River. The Government here did not recommend that Weaver go to the Low Bridge area, nor did they actively solicit information inquiries as to the Low Bridge area. The only evidence suggesting that the Government provided information to the public as to the Low Bridge area is: (1) passing references to it in the ROG, and (2) a sign at Peterson Bridge stating the flow time and distance to it. No trier of fact could reasonably conclude that these trivial references were sufficient to constitute the furnishing of information within the meaning of *Mandel,* thereby imposing a duty on the government as to land that it neither possessed nor controlled.[7]

---

[7]. The Government, in its motion, offers as an alternative basis for summary judgment, that it had no duty to warn as to an open and obvious danger. In as much as that allegation was not plead in Weaver's complaint and all the Counts have been disposed of, the Court does not address that argument.