# STATE OF MICHIGAN

# COURT OF APPEALS

In re Estate of MATTHEW JAMES GETTYS.

DEBRA A. MAY, Personal Representative of the
Estate of MATTHEW JAMES GETTYS,
Deceased,

      Plaintiff-Appellee,

v

MICHAEL ANTHONY DARLING, RYAN
THOMAS PHILLIPS, CROSSROADS INN a/k/a
NEW CROSS ROADS INN, INC.,

      Defendants,

and

JUDY OISTEN, Conservator for GUNNER
GETTYS, Minor,

      Appellant,

and

AMBER OSBORN, Conservator for BRAYDEN
GETTYS, Minor,

      Appellee.

UNPUBLISHED
December 8, 2015

No. 323295
Lake Circuit Court
LC No. 13-008531-NI

Before: SAAD, P.J., and STEPHENS and O'BRIEN, JJ.

PER CURIAM.

Appellant Judy Oisten (Oisten), as conservator for her son, Gunner Gettys, appeals by right the trial court's order distributing $354,666.67 in settlement proceeds arising out of a lawsuit involving the wrongful death of Matthew Gettys. We affirm.

-1-

Matthew Gettys (decedent) was killed in an automobile accident in the early morning hours of November 15, 2012. The decedent's mother, Debra May (May), as the personal representative for his estate, filed this wrongful death action.[1] The case was eventually settled for $545,000.00. After costs and attorney fees, $354,666.67 remained for distribution.

The decedent was the biological father of two children: Gunner Gettys, who was born on December 30, 2011, and Brayden Gettys, who was born on October 27, 2009. Oisten filed a request seeking the remaining distribution of $354,666.67 as the conservator for Gunner. Appellee Amber Osborn (Osborn), Brayden's mother, filed a request seeking $150,000.00 of the distribution as the conservator for Brayden. May also filed a request seeking $100,000.00 of the remainder.[2] After an evidentiary hearing, the trial court issued a written opinion distributing the remaining $354,666.67 as follows: $154,666.67 (approximately 44 percent) to Gunner, $125,000.00 (approximately 35 percent) to Brayden, and $75,000.00 (approximately 21 percent) to May.

The relationship that the decedent had with each of his sons could not be more different. The testimony presented demonstrated that when Gunner was born, the decedent was in the hospital room. From that moment on, witnesses testified, Gunner and his father shared an extremely close relationship. According to Oisten, decedent changed Gunner's diapers, fed Gunner, played with Gunner, and cradled, rocked, and cuddled with Gunner from the time he was born until decedent passed away. According to the decedent's close friend, Shane Yetzke, once Gunner was born, "Gunner was [decedent's] life." Yetzke testified that when the decedent came to visit he brought Gunner with him most of the time. After decedent's death, Oisten explained that Gunner lost "everything," suffered from severe separation anxiety, and returned to infantile behaviors such as carrying a blanket and using a pacifier.

Brayden and the decedent, on the other hand, never met. According to Osborn, when Brayden was three weeks old, it was arranged for the decedent to meet the child, but the decedent failed to appear. Once Brayden turned two years old, and after Gunner was born, the decedent contacted Osborn and expressed an interest in having a relationship with Brayden. Deoxyribonucleic acid (DNA) testing was scheduled in October 2012, to determine whether the decedent was Brayden's biological father, but Osborn and Brayden did not attend the testing because Osborn had relocated to Georgia for a temporary employment opportunity. Osborn eventually returned to Michigan, and the DNA testing was completed, but the decedent had passed when it was confirmed that he was Brayden's biological father. It is undisputed that the decedent never met or provided for Brayden during decedent's lifetime.

---

[1] The defendants in the wrongful death action were the owner of the vehicle, Ryan Thomas Phillips, the operator of the vehicle, Michael Anthony Darling, and the liquor serving establishment, Crossroads, Inn a/k/a New Cross Roads Inn, Inc. In light of the settlement, they are not parties to this appeal.

[2] The decedent was also survived by two siblings, sister Kristen Sower and brother Adam Gettys. However, they did not appear and raise a claim against the estate.

The disparate treatment of the children was in part due to the relationships with their mothers. Gunner's mother, Oisten, was in a long-term relationship with the decedent; the couple lived together and got engaged. Brayden's mother, Osborn, became pregnant shortly after meeting the decedent. Although the couple moved in together, the relationship did not last more than a few months, and they broke up before Brayden was born. Nonetheless, Osborn testified that she kept in contact with the decedent. She maintained that the decedent eventually expressed a desire to have a role in Brayden's life after experiencing the joy of fatherhood with Gunner. Indeed, Yetzke testified that, during Oisten's pregnancy with Gunner, the decedent indicated that he did not have a much of a relationship with his father and wanted to "be there for his son[.]" However, the decedent passed before receiving confirmation of his parentage of Brayden.

With regard to May, the interested parties disputed the relationship between mother and the decedent son after he turned 16 years old. Oisten and Yetzke testified that the two had limited contact and that May abandoned the decedent during his last two years of high school. On the contrary, May testified that she left the decedent with another family to allow him to graduate from high school with his friends. However, she claimed that after the decedent's graduation the two even lived together and worked for the same employer. May also asserted that the decedent called her when he learned of Osborn's pregnancy and that she drove the decedent and Oisten to the hospital and was there at the time of Gunner's birth.

Oisten argues that because decedent never met or provided for Brayden, the circuit court erred in concluding that Brayden had suffered a loss of society and companionship and a loss of financial support representing approximately 35 percent of the settlement proceeds. We disagree.

"A circuit court's decision concerning the distribution of settlement proceeds in a wrongful-death matter is reviewed for clear error. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Reed v Breton*, 279 Mich App 239, 241; 756 NW2d 89 (2008) (citations and internal quotation marks omitted). "Statutory interpretation presents a question of law that this Court also reviews de novo." *Thorn v Mercy Mem Hosp Corp*, 281 Mich App 644, 648; 761 NW2d 414 (2008). The goal of statutory interpretation is to ascertain and give effect to legislative intent by examining the language of the statute. *Id*. "Language of a statute must be applied as it is written and nothing should be read into the meaning of statutory language that is not within the intent of the Legislature as determined from the statute itself." *Id*. at 649. "[E]very word or phrase of the statute should be read in accordance with its plain and ordinary meaning." *Id*. Additionally, courts must consider the placement and purpose of the term in the statutory scheme. *Id*. at 650.

"Michigan's wrongful death act, MCL 600.2922 . . . provides for the distribution of proceeds to claimants who have suffered damages and also to the estate of the decedent for pain and suffering in an amount the court deems fair and equitable after considering the relative damages sustained by each of the persons and the estate." *McTaggart v Lindsey*, 202 Mich App 612, 615; 509 NW2d 881 (1993). MCL 600.2922 provides, in pertinent part, as follows:

(6) In every action under this section, the court or jury may award damages as the court or jury shall consider fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses for which the estate is liable; reasonable compensation for the pain and suffering, while conscious, undergone by the deceased during the period intervening between the time of the injury and death; and damages for the loss of financial support and the loss of society and companionship of the deceased. The proceeds of a settlement or judgment in an action for damages for wrongful death shall be distributed as follows:

* * *

(d) After a hearing by the court, the court shall order payment from the proceeds of the reasonable medical, hospital, funeral, and burial expenses of the decedent for which the estate is liable. The proceeds shall not be applied to the payment of any other charges against the estate of the decedent. The court shall then enter an order distributing the proceeds to those persons designated in subsection (3) who suffered damages and to the estate of the deceased for compensation for conscious pain and suffering, if any, in the amount as the court considers fair and equitable considering the relative damages sustained by each of the persons and the estate of the deceased. If there is a special verdict by a jury in a wrongful death action, damages shall be distributed as provided in the special verdict.

Subsection (3) sets forth those persons who may be entitled to damages as a result of a wrongful-death action and includes both children and parents. MCL 600.2922(3)(a).

"A claim for loss of society and companionship under the wrongful death act addresses compensation for the destruction of family relationships that results when one family member dies." *McTaggart*, 202 Mich App at 616. "There is, of course, no precise formula for determining damages for loss of a loved one's society and companionship." *In re Claim of Carr*, 189 Mich App 234, 238; 471 NW2d 637 (1991). "The only reasonable means of measuring the actual destruction caused is to assess the type of relationship the decedent had with the claimant in terms of objective behavior as indicated by the time and activity shared and the overall characteristics of the relationship." *McTaggart*, 202 Mich App at 616. The test for determining whether there has been a loss of financial support looks at the "reasonable expectation of support[.]" *Thompson v Ogemaw Co Bd of Road Comm'rs*, 357 Mich 482, 489; 98 NW2d 630 (1959); see also *Setterington v Pontiac Gen Hosp*, 223 Mich App 594, 607; 568 NW2d 93 (1997). Because of the difficulty in determining future support and the inability to prove or disprove its validity, the Legislature placed an emphasis on awarding damages that are deemed fair and equitable. See *Thompson*, 357 Mich at 490; MCL 600.2922(6). The definition of "equitable" includes what is fair and right in light of the facts and circumstances of the individual case. *Attorney General v Ankersen*, 148 Mich App 524, 553; 385 NW2d 658 (1986).

Given the use of the phrase "fair and equitable," we conclude that the Legislature intended to vest courts with broad discretion in distributing wrongful death proceeds. Here, in considering all the facts and circumstances that it deemed relevant, it was well within the trial

court's discretion to consider the potential relationship each child and their now-deceased father would have had as well as the financial support their father would have provided, even if that relationship and financial support had yet to begin, especially considering the children's ages. Moreover, the trial court was also permitted to rely on evidence that the decedent expressly intended to commence a familial relationship with Brayden similar to that of his relationship with Gunner. Therefore, we are not left with a definite and firm conviction that a mistake has been made. *Reed*, 279 Mich App at 241.

We are not persuaded by appellant's reliance on *In re Estate of Schmidt*, unpublished opinion per curiam of the Court of Appeals, issued February 25, 1997 (Docket No. 187381), and *Neal ex rel Estate of Gallmore v Kelly*, unpublished opinion per curiam of the Court of Appeals, issued August 19, 1997 (Docket No. 193049). In each of those cases, this Court affirmed a circuit court's distribution of minimal or zero wrongful-death proceeds to the fathers of the decedent-children. This Court explained that because the fathers had failed to develop a familial relationship with the children during their lifetime, there was no relationship from which a loss of society and companionship or a loss of financial support could result. First, we are not bound by those decisions. MCR 7.215(C)(1). Further, they are factually distinguishable in crucial ways. Most importantly, the parties seeking wrongful-death proceeds in those cases were fathers who chose not to have a familial relationship with their children. A parent cannot obtain a recovery when he "completely shirked" his parental responsibilities. *McTaggart*, 202 Mich App at 616. Conversely, here, Brayden, who was three years old at the time of his father's death, had no choice as to whether he had a relationship with the decedent; rather it was decedent's and Osborn's actions that controlled the situation. Moreover, here the evidence indicated that the decedent intended to have a familial relationship with Brayden.

Similarly, we reject appellant's challenge to the award rendered to May. The parties disputed the nature of the mother-son relationship, and it is evident from the award that the trial court resolved this issue in favor of May. When witnesses testify to diametrically opposed assertions of fact, the trier of fact must resolve the issue of credibility. *Kalamazoo Co Rd Comm'rs v Bera*, 373 Mich 310, 314; 129 NW2d 427 (1964). Accordingly, given the discretion afforded to the trial court by the Legislature under MCL 600.2922, and the specific facts and circumstances of this case, we conclude that the trial court's distribution of settlement proceeds was not clearly erroneous.

Affirmed.

/s/ Henry William Saad
/s/ Cynthia D. Stephens
/s/ Colleen A. O'Brien